## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LUCAS KOCH and GARETT KOCH, minors, by )
their mother and next best friend, DAWN )
DOERFLER KOCH, and DAWN DOERFLER )
KOCH, individually, )
                                   )
          Plaintiffs, )    Case No.  FILED: AUGUST 4, 2008
                                   )                08CV4395
          v. )                JUDGE KENNELLY
                                   )                MAGISTRATE JUDGE COLE
AVENT AMERICA, INC., an Illinois Corporation.)
                                   )
          Defendants. )               JH

### NOTICE OF REMOVAL

Defendant Philips Electronics North America Corporation ("PENAC") (the successor to Avent America, Inc.), by and through its attorneys and pursuant to 28 U.S.C. §§ 1441, 1446, and 1332(d), files this Notice of Removal of the above-captioned action pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, case number 08 CH 18433, to the United States District Court for the Northern District of Illinois, Eastern Division. In support of the Notice of Removal, PENAC states as follows:

### PROCEDURAL BACKGROUND

1.      Plaintiffs commenced this action by filing a complaint in the Circuit Court of Cook County, Illinois, County Department, Chancery Division on June 20, 2008, styled *Lucas Koch, et al.* v. *Avent America Inc.*, No. 08 CH 18433 (the "State Court Action"). A copy of the Complaint filed in the State Court Action is attached as Exhibit A.

2.      PENAC was served with the Summons and Complaint on July 7, 2008. A copy of the Summons is attached as Exhibit B. PENAC was also served on July 7, 2008 with a copy of Plaintiffs' Motion and Memorandum of Law in Support of Class Certification (attached as Exhibit C). According to the Circuit Court of Cook County, the motion for class certification was not filed separately from the Complaint and has not been noticed for

presentment. (*See* State Court Docket Report, attached as Exhibit D.)  No motion is pending in the State Court Action.

3.    Pursuant to 28 U.S.C. § 1446(a), Exhibits A-C attached hereto constitute "all process, pleadings, and orders served upon" PENAC in this action.

4.    As prescribed by 28 U.S.C. § 1446(b), PENAC has filed this Notice of Removal within thirty days after service of the initial pleading setting forth the claim for relief.

5.    Plaintiffs allege in the Complaint that PENAC misrepresented and/or failed to disclose alleged risks associated with its products containing Bisphenol-A.  Plaintiffs bring four causes of action on the basis of these allegations:  (i) violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILC § 505 *et seq.*; (ii) intentional misrepresentation; (iii) negligent misrepresentation; and (iv) strict liability (a product liability claim for which Plaintiffs seek both general and punitive damages).  (*See* Ex. A, Compl.) Plaintiffs also seek disgorgement of profits and injunctive relief for corrective advertising. (Ex. A, Compl. at Wherefore clause.)

6.    Plaintiffs have sought class certification pursuant to 735 ILCS 5/2-801 on behalf of a class consisting of "[a]ll consumers in Illinois who paid for polycarbonate baby bottles containing BPA manufactured by AVENT."  (Ex. A, Compl. at ¶ 36.)

7.    The Circuit Court of Cook County, Illinois is located within the geographical boundaries of the United States District Court for the Northern District of Illinois, Eastern Division.  28 U.S.C. § 93(a)(1).

8.    In accordance with 28 U.S.C. § 1446(d), PENAC will promptly file a copy of this Notice with the Clerk of the Circuit Court of Cook County, Illinois, in case number 08 CH 18433.

9.     No admission of fact or liability is intended by this Notice of Removal, and all defenses, affirmative defenses, and motions are hereby reserved.

## DIVERSITY JURISDICTION PURSUANT TO THE
## CLASS ACTION FAIRNESS ACT OF 2005

10.    This action is removable pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)).

11.    PENAC is a corporation incorporated in the State of Delaware with its principal place of business in Connecticut. Avent America, Inc. ("Avent America") was the United States subsidiary of Avent Holdings Limited headquartered in Southgate, England. On or about August 31, 2006, PENAC completed its acquisition of Avent America. Avent America subsequently merged with and into PENAC in June 2007. Avent America no longer has any separate corporate existence.

12.    The named Plaintiffs are each citizens of the State of Illinois (Ex. A, Compl. at ¶¶ 2-3), and Plaintiffs bring suit "individually, and as representatives of infants, children, and their parents of [sic] the State of Illinois." (Ex. A, Compl. at ¶ 14.) Diversity therefore exists between PENAC and at least one member of the purported class. 28 U.S.C. § 1332(d)(2)(A).

13.    The aggregate amount put in controversy by Plaintiffs' claims exceeds $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(6). Plaintiffs allege that the purported class includes "thousands of consumers" in Illinois. (Ex. A, Compl. at ¶ 36.) Plaintiffs seek restitution to the class "for the full value of all sales over the last five years of all children's items containing BPA." (*Id.* at p. 10.) In their motion for class certification, Plaintiffs further state that "[i]t is undisputed that [PENAC] has manufactured and distributed thousands, if not millions of baby bottles in Illinois containing BPA." (Ex. C, Mot. at 8.) Plaintiffs further seek both general and punitive damages for "thousands of consumers" under their product liability claim, which alone satisfy the amount in controversy requirement.

3

*Anthony v. Sec. Pac. Fin. Servs.*, 75 F.3d 311, 315 (7th Cir. 1996) ("Where both actual and punitive damages are recoverable under a complaint each must be considered to the extent claimed in determining the jurisdictional amount.").

14.    Plaintiffs seek attorneys' fees and costs of suit, which are also properly considered when determining the amount in controversy. *See Oshana* v. *Coca-Cola Co.*, 472 F. 3d 506, 512 (7th Cir. 2006).

15.    Plaintiffs also seek injunctive relief requiring additional warnings and corrective advertising (Ex. A, Compl. at p. 10). The costs PENAC would incur in complying with any such injunction must also be considered when calculating the amount in controversy, and these costs alone would satisfy the amount in controversy requirement. *Synfuel Techs., Inc.* v. *DHL Express (USA), Inc.*, 463 F. 3d 646, 652 (7th Cir. 2006); *see also Home Depot, Inc.* v. *Rickher*, No. 06-8006, 2006 U.S. App. LEXIS 32391, at *3 (7th Cir. May 22, 2006) ("The amount in controversy includes monetary damages, attorney's fees, and 'the cost a defendant incurs in complying with injunctive relief.'") (quoting *Tropp* v. *Western-Southern Life Ins. Co.*, 381 F.3d 591, 595 (7th Cir. 2004)).

16.    Finally, two class actions involving the same class and nearly identical claims have already been filed in this Court. Each case contains specific allegations that the amount in controversy exceeds $5,000,000. *See* Compl. in *Banse* v. *Avent America, Inc..* No. 08CV2604, attached as Exhibit E, at ¶ 7 *and* Compl. in *Brady* v. *Avent America, Inc.*, No. 08CV4189, attached as Exhibit F, at ¶ 7.

17.    This action is a class action within the meaning of Section 4 of the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(1)(B)) because this civil action was filed seeking class certification under 735 ILCS 5/2-801.

18.    Because this action is a class action within the meaning of Section 4 of the Class Action Fairness Act of 2005, at least one putative class member is a citizen of a

State other than Delaware or Connecticut, PENAC (the sole defendant) is a citizen of

Delaware and Connecticut, and the aggregate amount in controversy exceeds $5,000,000,

exclusive of interest and costs, this action is removable under Section 5 of the Class Action

Fairness Act of 2005 (codified at 28 U.S.C. § 1453(b)).

## CONCLUSION

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.

§ 1332. All procedural requisites to removal have been met. Accordingly, removal to this

Court under 28 U.S.C. § 1441 is proper and effected hereby.

Dated: August 4, 2008                              Respectfully submitted,


                                                   /s/ Kristen E. Hudson
                                                   Attorneys for Defendant
                                                   Philips Electronics North America Corporation

Paula E. Litt – ARDC #6187696
Kristen E. Hudson – ARDC #6281191
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
(312) 701-9300

*Of Counsel:*

Michael H. Steinberg
Brian R. England
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Tel: (310) 712-6600
Fax: (310) 712-8800

**CERTIFICATE OF SERVICE**

I, Kristen E. Hudson, an attorney, state that on August 4, 2008, I electronically

filed the foregoing **Notice of Removal** using the Court's CM/ECF system and will forward

same via e-mail and regular U.S. Mail to the below counsel of record:

Arthur S. Gold
Gold & Coulson
11 S. LaSalle, Suite 2500
Chicago, Illinois  60603
312.372.0777
312.372.0778 (Facsimile)
asg@gcjustice.com


/s/ Kristen E. Hudson

08CV4395
JUDGE KENNELLY
MAGISTRATE JUDGE COLE

JH

# EXHIBIT A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

LUCAS KOCH and GARETT KOCH, minors,   )
by their mother and next best friend, DAWN   )
DOERFLER KOCH, and DAWN DOERFLER   )
KOCH, individually,   )
  )
     Plaintiffs,   )    No.
  )
     v.   )
  )    JURY DEMAND
AVENT AMERICA INC., an Illinois   )
Corporation,   )
  )
     Defendant.   )

**08CH18433**

A TRUE COPY *Paul Verille*
OFF.  PAUL VERILLE
STATE MARSHAL
FAIRFIELD COUNTY, CT

### CLASS ACTION COMPLAINT

NOW COME Plaintiffs, LUCAS KOCH and GARETT KOCH, minors, by their mother and next best friend, DAWN DOERFLER KOCH, and DAWN DOERFLER KOCH, individually, by and through their attorneys, GOLD & COULSON, a partnership of professional and limited liability corporations, and BOLLINGER, RUBERRY & GARVEY, and complaining of Defendant AVENT AMERICA INC. (hereinafter referred to as "AVENT") allege as follows with respect to the above matter:

### INTRODUCTION

1. Plaintiffs seek redress against AVENT for its manufacture of plastic baby bottles that contain the chemical known as Bisphenol A ("BPA").

### THE PARTIES

2. Lucas and Garett Koch are infant minor twins, born on October 30, 2006, who live with their mother, Dawn Doerfler Koch and their father Kyle Koch in Chicago, Illinois and from the time of their birth on October 30, 2006 received their baby formula through a clear

polycarbonate plastic baby bottle that contained the chemical BPA purchased by their mother and father from various retail stores.

3.    Lucas and Garett are typical of the infants and children of their community in Illinois with respect to use of polycarbonate plastic baby bottles and infant or childrens' training cups, both containing the chemical BPA, manufactured by AVENT and sold at retail stores or supermarkets. Dawn Doerfler Koch purchased bottles manufactured by AVENT for Lucas and Garett.

4.    Plaintiffs seek to serve as CLASS REPRESENTATIVES for all similarly situated infants and children who use or have used these polycarbonate plastic baby bottles, and children's training or spill-resistant cups made by AVENT.

5.    AVENT AMERICA, INC. with Corporate Offices located at 475 Supreme Drive, Bensenville, Illinois, manufactures plastic baby bottles, nipples or nozzles, and childrens' training or spill-resistant type bottles containing BPA and does business in the State of Illinois, by offering its products to the Plaintiffs and other consumers for use by Illinois' infants and children; thereby exposing them to serious risks of harm and injury, in violation of Illinois law, as more specifically set forth below.

**FACTUAL BACKGROUND**

6.    BPA is used in the production of polycarbonate plastics as a building block and breaks down after baby bottles are washed in dishwashers, brushed or boiled and thereafter leaches into baby formula.

7.    There is extensive scientific literature reporting numerous adverse effects of BPA. Low BPA levels have been found to cause changes in behavior in the brain, prostrate gland and

2

mammary gland.  It is also linked to chromosomal damage, to sex-hormone imbalances, breast and prostate cancer, early puberty, miscarriage, low sperm count, and immune-system changes. BPA risk and exposure has been found to cause neural and behavioral effects in children specifically.

8.     While many adults may have been exposed to BPA, infants and growing children are particularly at risk to chemicals in their environment because they face greater exposure and are physiologically more susceptible to them.  Children's bodies are immature, with underdeveloped detoxification mechanisms to protect them from BPA.  Their brains and other organ systems are constantly developing; undergoing periods of particular sensitivity to damage or disruption.  As for BPA, infants lack a live enzyme that could help deactivate the chemical, rendering BPA more dangerous for infants than adults.  Because growing children are particularly at risk from BPA exposure, precautionary measures must be taken to protect children from such exposure.

9.     Scientists agree that BPA could harm human health, particularly the development of fetuses and children, because it works like the female sex hormone estrogen.  Other chemicals that mimic estrogen, such as DES, have already been definitively shown to interfere with hormone function and cause abnormalities in wildlife and laboratory animals.

10.     Numerous animal studies to date demonstrate that BPA exposure, even at very low doses, causes profound effects on laboratory animals, particularly during pregnancy and infancy, and can permanently rewire genetic programming before birth.  Experiments on rats found precancerous tumors, urinary tract problems, genitalia deformity and malformations, including Down's Syndrome, diabetes, obesity, impaired learning and memory, increased aggression, and elimination of sex differences in behavior.

3

11.    Unfortunately, because infants and children are at particular risk from BPA exposure, and because these adverse effects on a child's intellectual ability and growth, as well as the potential for exposure related disease take years or even decades to detect or diagnose, measures must be taken now to protect Illinois infants and children from exposure to baby bottles and other products containing BPA.

12.    The U.S. Government has asked the FDA to reconsider the safety of using BPA in products for use by infants and children.   In Canada, the government has already banned the use of polycarbonate bottles.

13.    Despite the extent of concern over the safety of BPA,  AVENT continues to market and sell its polycarbonate baby bottles, and continues to represent that the bottles are safe.  In fact, the recent findings and publicity are not based on new studies or evidence, but on information that has been available to AVENT well prior to the recent findings, and well prior to Plaintiff's purchase of AVENT's polycarbonate baby bottles.

## PLAINTIFFS' CLAIMS

14.    This action is brought on behalf of Plaintiffs, individually, and as representatives of infants, children, and their parents of the State of Illinois pursuant to 735 ILCS 5/2-801 for all others similarly situated. It is also brought against AVENT for its violation of §505 et. seq. of 815 ILCS, the Consumer Fraud and Deceptive Practices Act.  It arises from AVENT's failure to warn of, and/or otherwise disclose the risks and harmful effects of BPA on the consuming public.

15.    Parents and consumers who purchase polycarbonate bottles containing BPA made by AVENT and injected into Illinois' marketplace by retailers through their stores and

supermarkets, are kept in the dark and deliberately not provided with so much as a word of warning or information on the bottle or cup itself, or on the packaging of these products. They are not informed of the risks of potentially devastating effects that their infants and children are exposed to by using baby items made with BPA. AVENT should not be allowed to continue to gamble with the health and welfare of Illinois' infants and children while reaping enormous profits year after year in the face of clear and convincing scientific evidence screaming for an intervention on their behalf. The risk of harm and injury to the children of Illinois clearly outweighs the utility of including a highly dangerous and controversial chemical component BPA in the manufacture of baby bottles and cups intended for use by innocent and vulnerable infants and children of Illinois.

16.    During all times relevant hereto, AVENT engaged in long-term advertising campaigns aimed at large groups of Illinois consumers, including Plaintiffs. AVENT subjected Plaintiffs and all others similarly situated in the State of Illinois, to unnecessary risks of harm and injury by using a chemical substance which AVENT either knew to be unsafe or was aware of the existence of studies that have concluded its products made with BPA, was at the very least, potentially unsafe and unreasonably dangerous.

17.    As there have been hundreds of studies concluding that BPA exposure, even at very low doses, can cause many types of injuries or disorders, AVENT has deliberately and callously ignored the potential injuries its products could cause to Plaintiffs and other infants and children residing in Illinois. Defendant's conduct is both reprehensible and despicable and represents the worst form of corporate indifference toward the health and safety of Plaintiffs and all other Illinois consumers. Considering that AVENT has available to it a safer alternative to the use of

5

BPA, it could have avoided causing injury to Plaintiffs as well as the apprehension or fear of having sustained a latent injury, disease or disorder, including cancer, and to the rest of the members of the Class which Plaintiffs seek to represent. AVENT has shamefully subordinated the safety, health and welfare of Plaintiffs and the infants and children residing in the State of Illinois to is insatiable desire for profits at any cost.

18.    During all times relevant hereto, AVENT has, upon information and belief, possessed full knowledge of studies and reports that clearly link BPA with an increased risk of harm and injury to humans, especially infants and children. Moreover, AVENT has, upon information and belief, conducted its own independent studies and has made similar conclusions as those reached by independent and unbiased scientists who have found that BPA can cause numerous and varied injuries to lab animals even at very low doses. It is well established that infants and children are particularly sensitive, and therefore are at a heightened risk of harm and injury to BPA exposure and ingestion, due to their immature immune systems and underdeveloped detoxification mechanisms to the toxic effects and consequences of exposure to BPA .

During all times relevant hereto, these bottles and other children's items containing BPA have been and continue to be, widely marketed throughout the State of Illinois through stores and supermarkets.

### FIRST CAUSE OF ACTION - violation of 815 ILCS §505/1 et. seq.

19.    Plaintiffs incorporate paragraphs 1 through 18 as though fully set forth herein.

20.    Over the past five years, AVENT has engaged in a massive advertising campaign throughout Illinois that touts the safety and benefit of utilizing its products made with BPA .

21.    The advertising campaigns in print and television conducted by AVENT include statements and reassurances concerning the safety and effectiveness of these baby bottles, training cups and other children's items, as of the time of the filing of this Complaint.

22.    AVENT's misrepresentations and/or lack of disclosure of the heightened risk of harms of BPA has induced the public and the consumers to purchase these items for the infants and children of the State of Illinois.

23.    Plaintiffs and the public, including Plaintiffs' parents, were exposed to Defendant's advertisements for products containing BPA .

24.    Relying upon these misrepresentations and/or lack of disclosure concerning the risks, or potential risks of harm posed by these products, Plaintiffs, through their mother, and their mother, purchased polycarbonate plastic baby bottles containing BPA and used them to dispense liquid formula, water or other liquids, for their infants and children, thereby exposing Plaintiffs to harm and additional injury.

25.    At all times relevant hereto, AVENT knew its representations ensuring safety were false, or that they were marketing products known to be dangerous to the health, safety and well being of Plaintiffs and all other infants and children throughout the State of Illinois. Upon information and belief, AVENT put its lust for profits, and its desire to reap continued profits, above the safety, health, and well being of Plaintiffs and all other infants and children of the State of Illinois.

26.    At all times relevant hereto, AVENT made false or misleading representations with the intent of depriving Plaintiffs of property or other legal rights, or of otherwise causing the Plaintiffs injury. As a direct and proximate result of AVENT's misrepresentations and/or lack of

7

disclosure concerning the risk of harm associated with the use of products containing BPA , that were certain to come into frequent contact with the mouths of infants and children, and were made by AVENT, Plaintiffs spent a total of approximately $113 on products containing an unsafe and unreasonably dangerous substance known as BPA.

As a further direct and proximate result of AVENT's misrepresentations and/or lack of disclosure concerning the risk of harm associated with the use of products containing BPA, Plaintiffs and all other similarly situated, were exposed to dangerous and harmful levels and amounts of BPA.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation)

27.    Plaintiffs incorporate paragraphs 1 through 26, as though fully set forth herein.

28.    AVENT misrepresented the descriptions of its items in that it has not disclosed the existence of BPA or its known harmful health consequences in its advertising and packaging and instead has represented that its products are safe for the infants and children of the State of Illinois.

29.    The acts described herein above are deceptive and unfair because they misrepresent and/or affirmatively conceal the existence of BPA in children's items.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

30.    Plaintiffs incorporate paragraphs 1 through 29, as though fully set forth herein.

31.    AVENT has not disclosed the existence of BPA or its known harmful health consequences in its advertising and packaging and instead has represented that its products are safe for the infants and children of the State of Illinois.

32.    The acts described above are likely to mislead the general public and therefore constitute misleading practices.

## FOURTH CAUSE OF ACTION
### (Strict liability)

33.    Plaintiffs incorporate paragraphs 1 through 32, as though fully set forth herein.

34.    On October 30, 2006 and for a long period of time prior thereto, AVENT engaged in the business of distributing baby bottles utilized by consumers.

35.    At the time baby bottles were manufactured by and left the possession of AVENT and continuing up to the time of use by Plaintiffs as described herein, AVENT placed into the stream of commerce baby bottles which were unreasonably dangerous for their intended use in that they contained BPA and failed to provide sufficient warnings or markings to instruct or warn users or purchasers as to the dangers and hazards associated with the use of the baby bottles containing BPA.

## CLASS ALLEGATIONS

36.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to 735 ILCS 5/2-801, and seek to certify a class as follows:

> "All consumers in Illinois who paid for polycarbonate baby bottles containing BPA manufactured by AVENT."

The Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, it is ascertainable through

appropriate discovery. Plaintiffs believe that thousands of consumers have been victimized by AVENT's unfair and deceptive practices during the relevant period.

37.    Questions of law and fact are common to the Class and these common questions predominate over any questions affecting individual members.

38.    Plaintiffs will fairly and adequately protect the interest of the Class.

39.    Plaintiffs' counsel are experienced class-action attorneys.

40.    A class-action is an appropriate method for the fair and efficient adjudication of this dispute.

WHEREFORE, Plaintiffs demand the following relief against AVENT:

a.    an Order certifying this case as a class action;

b.    an Order designating Plaintiffs as class representatives and the law firms Gold & Coulson, and Bollinger, Ruberry & Garvey as class counsel;

c.    general damages in an amount according to proof;

d.    punitive damages in an amount according to proof;

e.    injunctive relief, including an Order suspending all further advertising by AVENT which does not include a bold typed disclosure indicating the contents include BPA, as well as a warning of the risks of harm prominently featured on the above described products; and for other corrective advertising;

f.    restitution to the Plaintiffs and to the Class of purchasers for the full value of all sales over the last five years of all children's items containing BPA ;

g.    attorney's fees;

h.    costs of suit; and

i.    such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

By: _____

One of Plaintiffs' attorneys

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street
Suite 2402
Chicago, IL  60603
(312) 372-0777 Telephone (312) 372-0778 Facsimile
 Attorney No. 5231

Michelle M. Bracke
Bollinger, Ruberry & Garvey
500 W. Madison
Suite 2300
Chicago, IL 60661
(312) 466-8000

c:\wp51\asg\AllClassAction\Koch\Complaint.wpd

11

# EXHIBIT B

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served by Mail |
| 2420 - Served by Publication | 2421 - Served by Publication |
| SUMMONS | ALIAS - SUMMONS |

(Rev.12/22/92) CCG-1

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

**LUCAS KOCH, et al.**

**Plaintiffs**

v.

**AVENT AMERICA INC.,**
**Defendants.**

**No. 08 CH 18433**

Please serve:
Avent America, Inc.
A/K/A Phillips Avent America, Inc.
1600 Summer Street
Stamford, CT 06945

### ALIAS SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☒ Richard J. Daley Center, 50 W. Washington, Room _____, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District5- Bridgeview
10220 S. 76th St.
Bridgeview, IL 60455

☐ District 6- Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.
To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

A TRUE COPY *Paul Verille*
OFF. PAUL VERILLE
STATE MARSHAL
FAIRFIELD COUNTY, CT

WITNESS, _____,20___

JUN 20 2008

Clerk of Court
DOROTHY BROWN
CLERK OF CIRCUIT COURT

Date of service_____,20___
(To be inserted by officer on copy left with
defendant or other person)

Name        Gold & Coulson
Attorney for  Plaintiff
Address      11 S. LaSalle St., Ste. 2402
City         Chicago, IL 60603
Telephone    (312)372-0777
Atty. No.    5231

**Service by Facsimile Transmission will be accepted at _____
(Area Code) (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# EXHIBIT C

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| LUCAS KOCH and GARETT KOCH, minors, by their mother and next best friend, DAWN DOERFLER KOCH, and DAWN DOERFLER KOCH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>AVENT AMERICA INC., an Illinois Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.<br><br>08CH 18433 |

## PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF CLASS CERTIFICATION

NOW COME Plaintiffs, LUCAS KOCH and GARETT KOCH, minors, by their mother and next best friend, DAWN DOERFLER KOCH, and DAWN DOERFLER KOCH, individually, by and through their attorneys, GOLD & COULSON, a partnership of professional and limited liability corporations, and BOLLINGER, RUBERRY & GARVEY, and move for class certification of a class of:

"All consumers in Illinois who paid for polycarbonate baby bottles containing BPA manufactured by AVENT."

### INTRODUCTION

Plaintiffs seek redress against AVENT AMERICA INC. ("AVENT") for its manufacture of plastic baby bottles that contain the chemical known as Bisphenol A ("BPA"). BPA is used in the production of polycarbonate plastics as a building block and breaks down after baby bottles are washed in dishwashers, brushed or boiled. It thereafter leaches into baby formula. There is

1

extensive scientific literature reporting numerous adverse effects of BPA. Low BPA levels have been found to cause changes in behavior in the brain, prostrate gland and mammary gland as well as chromosomal damage, sex-hormone imbalances, breast and prostate cancer, early puberty, miscarriage, low sperm count, and immune-system changes. BPA risk and exposure has been found to cause neural and behavioral effects in children specifically.

While many adults may have been exposed to BPA, infants and growing children are particularly at risk. They face greater exposure and are physiologically more susceptible. Children's bodies are immature, with underdeveloped detoxification mechanisms to protect them from BPA. Their brains and other organ systems are constantly developing; undergoing periods of particular sensitivity to damage or disruption. As to BPA, infants lack a live enzyme that could help deactivate the chemical, rendering BPA much more dangerous for infants than adults. Because growing children are particularly at risk from BPA exposure, precautionary measures must be taken to protect children from such exposure.

Scientists agree that BPA could harm human health, particularly the development of fetuses and children, because it works like the female sex hormone estrogen. Other chemicals that mimic estrogen, such as DES, have already been definitively shown to interfere with hormone function and cause abnormalities in wildlife and laboratory animals. Numerous animal studies to date demonstrate that BPA exposure, even at very low doses, causes profound effects on laboratory animals, particularly during pregnancy and infancy and that BPA can permanently rewire genetic programming before birth. BPA has also been linked to chromosome sorting errors, genitalia deformity and malformations, including Down's Syndrome, diabetes, obesity, impaired learning and memory, increased aggression, reversal of normal sex differences in the

2

brain structure, and elimination of sex differences in behavior.

Unfortunately, because infants and children are at particular risk from BPA exposure, and because these adverse effects on a child's intellectual ability and growth, as well as the potential for exposure related disease take years or even decades to detect or diagnose, measures must be taken now to protect Illinois infants and children from exposure to baby bottles and other products containing BPA.

Polycarbonate baby bottles are now banned in Canada, and the U.S. Government has asked the FDA to reconsider the safety of using BPA in products for use by infants and children. In Canada, the government has already banned the use of polycarbonate bottles. Despite the extent of concern over the safety of BPA, AVENT continues to market and sell its polycarbonate baby bottles, and continues to represent that the bottles are safe. In fact, the recent findings and publicity are not based on new studies or evidence, but on information that has been available to AVENT well prior to the recent findings, and well prior to Plaintiffs' purchase of AVENT's polycarbonate baby bottles.

## BACKGROUND

This action is brought on behalf of Plaintiffs, individually, and as representatives of infants, children, and their parents in the State of Illinois pursuant to 735 ILCS 5/2-801 for all others similarly situated. It is also brought against AVENT for its violation of § 505 et. seq. of 815 ILCS, the Consumer Fraud and Deceptive Practices Act. It arises from AVENT's failure to warn of, and/or otherwise disclose the risks and harmful effects of BPA on the consuming public.

Parents and consumers who purchase polycarbonate bottles containing BPA made by AVENT and injected into Illinois' marketplace by retailers through their stores and

supermarkets, are kept in the dark and deliberately not provided with so much as a word of warning or information on the bottle or cup itself, or on the packaging these products come in. They are not informed of the risks of potentially devastating effects that their infants and children are exposed to by using baby items made with BPA. AVENT should not be allowed to continue to gamble with the health and welfare of Illinois' Infants and Children while reaping enormous profits year after year in the face of clear and convincing scientific evidence screaming for an intervention on their behalf. The risk of harm and injury to the children of Illinois clearly outweighs the utility of including the highly dangerous and controversial chemical component BPA in the manufacture of baby bottles and cups intended for use by innocent and vulnerable infants and children of Illinois.

    During all times relevant hereto, AVENT engaged in long-term advertising campaigns aimed at large groups of Illinois consumers, including Plaintiffs. AVENT subjected Plaintiffs and all other similarly situated in the State of Illinois, to unnecessary risks of harm and injury by using a chemical substance, which AVENT either knew to be unsafe or was aware of the existence of studies that have concluded its products made with BPA, was at the very least, potentially unsafe and unreasonably dangerous. As there have been hundreds of studies concluding that BPA exposure, even at very low doses, can cause many types of injuries or disorders, AVENT has deliberately and callously ignored the potential injuries its products could cause to Plaintiffs and other infants and children residing in Illinois. Defendant's conduct is both reprehensible and despicable and represents the worst form of corporate indifference toward the health and safety of Plaintiffs and all other Illinois consumers. Considering that AVENT has available to it a safer alternative to the use of BPA, it could have avoided causing injury to

4

Plaintiffs as well as the apprehension or fear of having sustained a latent injury, disease or

disorder, including cancer, and to the rest of the members of the Class which Plaintiffs seek to

represent. AVENT has shamefully subordinated the safety, health and welfare of Plaintiffs and

the infants and children residing in the State of Illinois to its insatiable desire for profits at any

cost.

During all times relevant hereto, AVENT has, upon information and belief, possessed full

knowledge of studies and reports that clearly link BPA with an increased risk of harm and injury

to humans, especially infants and children. Moreover, AVENT has, upon information and belief,

conducted its own independent studies and has made similar conclusions as those reached by

independent and unbiased scientists who have found that BPA can cause numerous and varied

injuries to lab animals even at very low doses

## I.    THIS ACTION IS SUITABLE FOR CLASS CERTIFICATION

In Illinois, class certification is governed by 735 ILCS 5/2-801. That section requires that

four elements be satisfied before an action may be maintained as a class action: (1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of fact or law

common to the class that predominate over individual questions; (3) the representative parties

will fairly and adequately protect the interest of the class; and (4) the class action is an

appropriate method for the fair and efficient adjudication of the controversy. Purcell & Wardrobe

Chartered v. Hertz Corp., 175 Ill. App. 3d 1069, 1073, 125 Ill. Dec. 585, 530 N.E.2d 994 (1988).

In considering whether to certify a class, a court should assume the truth of the allegations

in the complaint and that a cause of action exists. Sturdevant v. Deer, 73 F.R.D. 375, 378

(E.D.W.I. 1976)(citing Blackie v. Barrack, 524 F.2d 891, 901 n. 16 (9th Cir. 1975), cert. denied,

5

429 U.S. 816 (1976)); In re Bank of Boston Corp. Sec. Litigation, 762 F.Supp. 1525 (D. Mass. 1991); Sharif by Salahuddin v. New York State Education Department, 127 F.R.D. 84, 87 (S.D.N.Y. 1989); Ventura v. New York City Health & Hospitals Corp., 125 F.R.D. 595, 598 (S.D.N.Y. 1989); Allen v. Chicago Transit Auth., 2000 U.S. Dist. LEXIS 11043 (N.D.Ill. 2000) (citing Heastie v. Community Bank of Greater Peoria, 125 F.R.D. 669, 671 (N.D.Ill. 1989)). The court should not look into the merits of the complaint at this juncture. Lamphere v. Brown University, 553 F.2d 714 (1st Cir. 1977); Bonilla v. Trebol Motors Corporation, 1993 U.S. Dist. LEXIS 5775 (D.P.R. 1993); Modell v. Eliot Savings Bank, 139 F.R.D. 17; 1991 U.S. Dist. LEXIS 15000 (D.Mass. 1991).

Furthermore, the court should resolve any doubt regarding the propriety of certification "in favor of allowing the class action," so that it will remain an effective vehicle for deterring corporate wrongdoing. Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968), cert. denied, 394 U.S. 928 (1969); Welch v. Board of Directors of Wildwood Golf Club, 146 F.R.D. 131, 1993 U.S. Dist. LEXIS 2223, *5 (W.D.Pa. 1993) (in doubtful cases, "courts should err in favor of allowing the class certification"); Lessard v. Metropolitan Life Insurance Co., 103 F.R.D. 608, 610 (D.Me. 1984); accord, In re Folding Cartons Antitrust Litigation, 75 F.R.D. 727 (N.D.Ill. 1977). As the court stated in Esplin:

> Without the class action device, many actionable wrongs would go uncorrected and persons affected thereby unrecompensed. In essence, the class action device is a bona fide method for redressing violations of the . . . laws and for compelling compliance with their mandates. Accordingly, the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action.

Similarly, the Illinois Appellate Court stated:

6

> In a large and impersonal society, class actions are often the last barricade of consumer protection . . . . to consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups. The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting. The alternative to the class action -- private suits or governmental actions -- have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective. The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer.

Eshaghi v. Hanley Dawson Cadillac Co., 214 Ill. App. 3d. 995, 574 N.E.2d 760, 766 (1st. Dist. 1991).

## A.    NUMEROSITY – 735 ILCS 5/2-801(1)

The first requirement of 735 ILCS 5/2-801 is that the class members are so numerous that joinder is not practicable. The numerosity prerequisite is satisfied if it is reasonable to conclude that the number of members of the proposed class is greater than the minimum number required for class certification, which is about 30-40. There is no set number which equates with impracticability in all cases, but a presumption of numerosity has developed at the 40-member level:

> ... In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.

1 H. Newberg & A. Conte, Newberg On Class Actions § 3.05 at 3-25 (3rd ed. 1992).

It is not necessary that the precise number of class members be known. In re Screws Antitrust Litigation, 91 F.R.D. 52, 55 (D. Mass. 1981); Baum v. Centronics Data Computer Corp., Fed. Sec. L. Rep. (CCH) P92,797 Slip Opinion (D.N.H. 1986); Somerville v. Major Exploration, Inc., 102 F.R.D. 500, 503 (S.D.N.Y. 1984); McCleery Tire Service, Inc. v. Texaco, Inc., 1975-2

7

Trade Cas. (CCH) ¶60,581 (E.D.Pa. 1975). In this case, Plaintiffs have a    Wells v. Thomas McDonough, NPC Check Servs., 1998 U.S. Dist. LEXIS 4441 (N.D. Ill. 1998), at *6. As in Wells, "common sense supports this conclusion." Id.

It is undisputed that AVENT has manufactured and distributed thousands, if not millions of baby bottles in Illinois containing BPA.

Accordingly, Plaintiffs have shown that the class is sufficiently large so that joinder would be impracticable. Westcott v. Califano, 460 F. Supp. 737 (D.Mass. 1978), aff'd sub nom. Califano v. Westcott, 443 U.S. 76 (1979); 1 H. Newberg, Class Actions, at 3.03 (2d ed. 1985).

### B.    TYPICALITY/COMMONALITY - 735 ILCS 5/2-801(2)

The commonality standard is met if there are "questions of law or fact common to the class". Ashe v. Board of Elections, 124 F.R.D. 45, 48 (E.D.N.Y. 1989) (rejecting assertion that factual differences destroyed commonality where common questions of law existed, because the plaintiffs "need only demonstrate common questions of fact or law"); see also Miner v. Gillette Co., 428 N.E.2d 478 (Ill. 1981); Purcell & Wardrobe, Chartered v. Hertz Corp., 530 N.E.2d 994 (Ill. App. Ct. 1988); Luyando v. Bowen, 124 F.R.D. 52, 55 (S.D.N.Y. 1989) ("minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law").

A number of common questions of law or fact are presented in this case. These questions include, among others:

(a)  whether AVENT failed to properly warn consumers of the danger of BPA; and

(b)  whether AVENT's conduct violates 765 ILCS 1075/10, *et seq.*

Common questions need only predominate -- they need not be unanimous. Mattoon v.

8

City of Pittsfield, 128 F.R.D. 17 (D.Mass. 1989);  Brown v. Pro Football, Inc.,

146 F.R.D. 1 (D.D.C. 1992);  Kleiner v. First National Bank, 751 F.2d 1193 (11th Cir. 1985);

Wolfson v. Artisans Savings Bank, 83 F.R.D. 547 (D.Del. 1979) (class action maintainable even

though individual questions needed to be litigated);  Berenson v. Faneuil Hall, 100 F.R.D. 468,

470 (D.Mass. 1984).

Moreover, common questions need not be dispositive of the entire action.  Esplin v.

Hirschi, 402 F.2d 94 (10th Cir. 1968); see, also Liberty Alliance for the Blind v. Califano, 668

F.2d 333 (3rd Cir. 1977) (class relief not barred even though need existed for calculations of

individual benefits);  Kleiner v. First National Bank of Atlanta, 97 F.R.D. 683 (N.D.Ga. 1983)

rev'd on other grounds in Kleiner v. First National Bank, 751 F.2d 1193 (11th Cir. 1985) (Rule

23(a) requires that common questions predominate and not that they be unanimous);  Wolfson v.

Artisans Savings Bank, 83 F.R.D. 547 (D.Del. 1979) (class action maintainable even though

individual questions needed to be litigated);  In re Sugar Industry Antitrust Litigation, 73 F.R.D.

322, 344 (E.D. Pa. 1976).

Instead, common questions sufficiently predominate if their resolution would "provide a

definite signal of the beginning of the end."  Mertens v. Abbott Labs, 99 F.R.D. 38, 41 (D.N.H.

1983).  See Bonilla, supra.  Likewise, common questions predominate if there is a "common

nucleus of operative facts" relevant to the dispute.  E.g., Esplin v. Hirschi, 402 F.2d 94, 99 (10th

Cir. 1968), cert. denied, 394 U.S. 928 (1969);  Blackie v. Barrack, 524 F.2d at 905-08;  Bisgier v.

Fotomat Corp., 62 F.R.D. 113 (N.D.Ill. 1972);  Steiner v. Equimark Corp., 96 F.R.D. 603, 607

(W.D.Pa. 1983);  Miles v. N. J. Motors, 32 Ohio App.2d 350, 291 N.E.2d 758, 763-64 (1972);

Halverson v. Convenient Food Mart, Inc., 69 F.R.D. 331 (N.D.Ill. 1974) (common "factual link"

for which the law provides a remedy).

The Plaintiffs, and all other class members, are victims of AVENT's failure to warn of the dangerous BPA. They purchased baby bottles relating in AVENT's financial gain in the same manner. These factual allegations do not vary from one class member to another. The common questions of law and fact involved in this action make it ideal for class certification.

While there may be slight factual differences between the class members, that does not preclude certification. For example, in Gordon v. Boden, 224 Ill. App.3d 195 (1st Dist, 1991), the defendant argued class certification was precluded by factual differences surrounding each class member's purchase of the allegedly adulterated product, and questions of each individual's reliance on the defendant's statements. The Court rejected such arguments, finding, "A class action can properly be prosecuted where a defendant is alleged to have acted wrongfully in the same basic manner as to an entire class. In such circumstances, the common class questions still predominate the case, and the class action is not defeated." Id. at 201 (Citing Brooks v. Midas International Corp., 47 Ill. App. 3d 266, 273). The court further noted, "the other questions that defendants raise, pertaining to the exact circumstances of each class member's purchase, fail to show that the common question does not predominate." Id.

The identification of the class members, and the computation of the relief to be afforded each class member, can be accomplished by a ministerial examination of the Defendant's files. In any event, "[w]hether and to what extent the class members sustained damages is not an issue at the class certification stage." Baum v. Centronics Data Computer Corp., Fed. Sec. L. Rep. (CCH) P92,797 (D.N.H. 1986) citing Grossman v. Waste Management, Inc., 100 F.R.D. 781,

784, 589 F. Supp. 395 (N.D. Ill. 1984), Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974);

Bonilla, supra, at 5775 *3;  Liberty Alliance for the Blind v. Califano, 668 F.2d 333 (3rd Cir.

1977) (class relief not barred even though need existed for calculations of individual benefits).

### C. ADEQUACY OF REPRESENTATION – 735 ILCS 5/2-801(3)

The adequacy of representation requirement is satisfied if Plaintiffs' counsel is qualified,

experienced, generally able to conduct the proposed litigation, and there are no antagonistic

interests between the representative party and the class.  Secretary of Labor v. Fitzsimmons, 805

F.2d 682, 697 (7th Cir.1986).

Plaintiffs' counsel and co-counsel have extensive experience in class action litigation. *See*

Website of Plaintiffs' Counsel: www.gcjustice.com.  No antagonistic interest exists to prevent

Plaintiffs from being a fair and adequate representatives of the class.

### D.    FAIR AND EFFICIENT ADJUDICATION OF THE ACTION – 735 ILCS 5/2-801(4)

A class action may be maintained if the court finds that questions of law or fact common

to the class predominate over any questions affecting only individual members, and if the court

finds that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy.

A class action is the only appropriate means of resolving this controversy.  It is not

economical for Plaintiffs and those like them to individually undertake prosecution of AVENT

for its conduct.  Further, such a process would waste judicial resources and permit AVENT to

continue its practice.  After all, many of the class members are still unaware of AVENT's

conduct and BPA's danger.

Recovery by many class members may not be significant.  It is not economical for the

Plaintiffs, nor for many of the class members, to hire an attorney to individually fight a corporation like AVENT. Few attorneys would express interest in doing so on a contingency fee basis, if recovery is limited. This is precisely the sort of case contemplated by the class action statute -- a scheme by a surreptitious corporation to violate the rights of many unsuspecting victims.

"By allowing aggregation of numerous small claims in one action, class actions provide a judicial vehicle for redress which, were separate actions required, would not be financially feasible." J.W. Smith & H.B. Zobel, Rules Practice at 23.1 (1975). "[O]ne of the primary functions of the class suit is to provide a device for vindicating claims, which, taken individually, are too small to justify legal action but which are of significant size if taken as a group." Leardi v. Brown, 394 Mass. 151, 474 N.E.2d 1094, 1101 (1985); Brady v. LAC, Inc., 72 F.R.D. 22, 28 (S.D.N.Y. 1976) ("[T]he benefits to the large number of class members, many of whose claims are so small that their size does not provide the impetus to bring individual actions, clearly outweigh any problems which may arise in the management of the class action. Economy will undoubtedly be achieved. Not only economy which will benefit members of the class, but economy which will benefit the judicial system as well"); Grace v. Perception Technology Corporation, 128 F.R.D. 165, 167; 1989 U.S. Dist. LEXIS 16093 (D.Mass. 1990), citing Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 305 (D. Mass. 1987); Berenson, 100 F.R.D. at 471; Berman v. Narragansett Racing Association, 414 F.2d 311, 317 (1st Cir. 1969), cert. denied, 396 U.S. 1037, 24 L. Ed. 2d 681, 90 S. Ct. 682; Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, [1975-76] Fed.Sec.L.Rptr. (CCH) para. 95,377 at 98,888 (S.D.N.Y. 1975); Newberg, 22.38; Issen v. GSC Enterprises, 522 F. Supp. 390, 400 (N.D.Ill. 1981)

12

## II.  **CONCLUSION**

As demonstrated above, this case is ideally suited for class certification.  Each of the

prerequisites for a class action is met.  Indeed, the nature of the practice complained of --

subverting the rights of large numbers of unsuspecting victims whose claims are too small to

make individual litigation practicable -- is such as to make a class action essential.

For the reasons stated above, Plaintiffs respectfully request that their Motion for Class

Certification be granted.

Respectfully submitted,
on behalf of the Plaintiffs,

Attorney for Plaintiffs

Arthur S. Gold
GOLD & COULSON
11 S. LaSalle Street
Suite 2402
Chicago, IL 60601
312-372-0777
312-372-0778 (facsimile)

Michelle Bracke
Bollinger, Ruberry & Garvey
500 W. Madison
Suite 2300
Chicago, IL 60661
(312) 466-8000

A TRUE COPY Paul Verille
OFF.   PAUL VERILLE
STATE MARSHAL
FAIRFIELD COUNTY, CT

C:\WP51\ASG\ALL CLASS ACTION\Koch\Class Cert Motion & Memo.wpd

13

# EXHIBIT D



### Dorothy Brown
# Clerk *of the*
# Circuit Court
### Cook County

Case Information Summary for Case Number
2008-CH-18433

Filing Date: 5/20/2008
Division: Chancery Division
Ad Damnum: $0.00

Case Type: CLASS ACTION
District: First Municipal
Calendar: 07

### Party Information

**Plaintiff(s)**
KOCH LUCAS

**Attorney(s)**
LEVENFELD AND GOLD
11 S LASALLE #2500
CHICAGO IL, 60603
(312) 372-0777

KOCH GARETT

KOCH DAWM

KOCH DAWN D

**Date of Service**    **Defendant(s)**
AVENT AMERICAN INC

**Attorney(s)**

### Case Activity

Activity Date: 5/20/2008                    Participant: KOCH LUCAS

CLASS ACTION COMPLAINT FILED (JURY DEMAND)

Court Fee: 549.00                Attorney: LEVENFELD AND GOLD

Activity Date: 5/23/2008                    Participant: KOCH LUCAS

CASE SET ON CASE MANAGEMENT CALL

Date: 10/22/2008                              Judge: EPSTEIN, JAMES R.
Court Time: 1000                           Attorney: LEVENFELD AND GOLD
Court Room: 2405


Activity Date: 6/20/2008                    Participant: AVENT AMERICAN INC

ALIAS SUMMONS ISSUED AND RETURNABLE

Court Fee: 6.00                            Attorney: LEVENFELD AND GOLD

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the
Circuit Court of Cook County warrants the accuracy, completeness, or the currency
of this data. This data is not an official record of the Court or the Clerk and may
not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data
in our master database.


Return to Search Page

08CV4395
JUDGE KENNELLY
MAGISTRATE JUDGE COLE

JH

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| ELIZABETH BANSE, *on behalf of herself and all other similarly situated persons,*<br><br>Plaintiffs,<br><br>v.<br><br>AVENT AMERICA, INC., *on behalf of itself and on behalf of a Defendant Class of producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A*<br><br>Defendants. | **FILED: MAY 6, 2008**<br>**Case No.** 08CV2604          TG<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>JUDGE COAR<br>MAGISTRATE JUDGE DENLOW |

Plaintiff Elizabeth Banse ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint (the "Complaint") and alleges upon personal knowledge matters pertaining to herself and her own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by her counsel:

### I.    SUMMARY OF THE ACTION

1.    This is a nationwide class action lawsuit brought on behalf of Plaintiff and other similarly situated individuals (the "Plaintiffs" and the "Plaintiff Class") against Avent America, Inc. ("Defendant Avent"), individually, and as the representative of a Defendant class (the "Defendants" and the "Defendant Class") comprised of all entities which produce, manufacture, and/or otherwise distribute polycarbonate plastic bottle products containing the industrial

chemical Bisphenol-A ("BPA") that have been subsequently purchased by Plaintiffs. Specifically, Plaintiff brings this action on behalf of those who, over the past five years, purchased polycarbonate plastic bottle products containing BPA that were produced, manufactured, distributed, and/or sold by the Defendants and who were accordingly damaged thereby.

2.      BPA, a chemical which Defendants use to make their polycarbonate plastic bottle products, is a dangerous chemical that has been linked to serious human health problems. Indeed, researchers and scientists have been very concerned with the harmful effects of BPA for an extended period of time.   For well over a decade, hundreds of studies and papers, including very recent reports, have repeatedly shown that BPA can be toxic to humans even at extremely low doses.  Recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

3.      Yet, as alleged more fully below, despite this well-documented scientific evidence, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using this dangerous chemical which has been known for years to be toxic in several respects and which poses serious hazards to individuals' health.   Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual human health with little or no mention as to potentially toxic substance the products contain.

4.      Quite simply, Defendants have breached (and continue to breach) their duty to adequately disclose relevant and appropriate information regarding BPA in the marketing and sale of their polycarbonate plastic bottle products.  Accordingly, Plaintiff seeks redress in the form of disgorgement, restitution and any other appropriate relief including injunctive relief.

## II.    PARTIES

5.      Plaintiff is a resident of Seattle, Washington.  Plaintiff purchased polycarbonate plastic bottle products containing BPA and bearing the mark of Defendant Avent.

6.      Defendant Avent America, Inc. is an Illinois Corporation with its principal offices located in Bensenville, Illinois.  Defendant Avent produces, manufactures, distributes, and/or sells an array of polycarbonate plastic bottle products, which are primarily baby bottles and baby bottle accessories.

## III.    JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d).  The Plaintiff Class involves more than 100 individuals.  A member of the Plaintiff Class is a citizen of a state different from the Defendants, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000.00 exclusive of interest and costs.

8.      Venue is proper in this district under 28 U.S.C. §1391.  Defendant Avent is incorporated under the laws of the State of Illinois; has availed itself to the laws and protection of the State of Illinois; markets and sales plastic bottle products here; and has its principal offices in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Bisphenol A, Its Uses, And Actual/Potential Health Risks.

9.      As discussed above, this action concerns potentially toxic material used in polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by Defendants.    The potentially toxic material, otherwise known as the industrial chemical

3

Bisphenol-A (2, 2-bis (4-hydroxyphenly)-propane, hereinafter referred to as "BPA"), is currently used as a primary monomer[1] in polycarbonate plastic and epoxy resins.[2]

10.    BPA is a fundamental building block in polycarbonate plastics that are widely used in a myriad of consumer products – from mostly clear plastic baby bottles, training or spill-proof cups, and reusable drink containers (like those produced, manufactured, distributed, and/or sold by Defendants and purchased by Plaintiffs) to children's toys, microwavable food containers, beverage cans with epoxy linings, and hundreds of other products that consumers come into contact with every day.

11.    Although the strong polycarbonate plastic that BPA is used for appears indestructible and safe, unfortunately the material is dangerously flawed in a manner undetectable to the human eye. The ester bond that links BPA monomers to one another to form polymer chains is not stable, and thus the polymer decays with time. When liquid or food comes into contact with the decayed area, BPA is released into the liquid or food and ingested by the consumer. This leaching of BPA from the plastic into the liquid or food is accelerated when these bottles are subjected to heat such as when the bottle is microwaved.

12.    The extreme cause for concern is that, for well over a decade, scientists have commented on, and been very troubled with, the harmful effects of BPA on human health. Hundreds of studies and papers have repeatedly shown that BPA can be toxic even at extremely

---

[1]    A monomer is a small molecule that may become chemically bonded to other monomers to form a polymer. A polymer is a substance composed of molecules with large molecular mass consisting of repeating structural units, or monomers, connected by covalent chemical bonds. The individual molecules that comprise a polymer are referred to as polymer molecules. In popular usage, the term "polymer" is used as a synonym for plastic.

[2]    Epoxy resins are polyether resins formed originally by the polymerization of Bisphenol-A and epichlorohydrin, having high strength, and low shrinkage during curing and can be used as a coating, adhesive, casting, or foam.

low doses and recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

13.    Most recently, in April 2008, the National Toxicology Program ("NTP") issued a draft brief prepared by the NTP Center for the Evaluation of Risks to Human Reproduction ("CERHR") titled *DRAFT NTP BRIEF ON BISPHENOL A* (hereafter "NTP Draft Brief," attached hereto as Exhibit A) that discusses the chemical, human exposure, and whether BPA can affect human development or reproduction.

14.    The salient points about what BPA is and its uses are summarized below:

a.    BPA is a high production volume chemical that is widely used in the manufacture of polycarbonate plastics and epoxy resins;

b.    Polycarbonate plastics have many applications including use in certain food and drink packaging, e.g., water and infant bottles, compact discs, impact-resistant safety equipment, and medical devices;

c.    Polycarbonate plastics are typically clear and hard and marked with the recycle symbol "7" or may contain the letters "PC" near the recycle symbol; and

d.    Epoxy resins are used as lacquers to coat metal products such as food cans, bottle tops, and water supply pipes.

15.    NTP also explains how humans come into contact with BPA:

a.    The primary source of exposure to BPA for most people is through the diet, in food and beverages;

b.    BPA can migrate into food from food and beverage containers with internal epoxy resin coatings and from consumer products made of polycarbonate plastic such as baby bottles, tableware, food containers, and water bottles;

c.      The highest estimated intakes of BPA in the general population occur in infants and children.  Infants and children have higher intakes of many widely detected environmental chemicals because they eat, drink, and breathe more than adults on a pound for pound basis.  In addition, infants and children spend more time on the floor than adults and may engage in certain behaviors, such as dirt ingestion or mouthing of plastic items that can increase the potential for exposure; and

d.      Biomonitoring studies show that human exposure to BPA is widespread.  The 2003 – 2004 National Health and Nutrition Examination Survey (NHANES III) conducted by the Centers for Disease Control and Prevention (CDC) found detectable levels of BPA in 93% of 2517 urine samples from people 6 years and older.  This study did not include children younger than 6 years of age.  The CDC NHANES data are considered representative of exposures in the United States because of the large number of people included in the survey and the process used to select participants.  In addition, the analytical techniques used by the CDC to measure BPA are considered very accurate by the scientific community.

16.      NTP observed that studies with laboratory rodents show that exposure to high dose levels of BPA during pregnancy and/or lactation can reduce survival, birth weight, and growth of offspring early in life, and delay the onset of puberty in males and females.  "These 'high' dose effects of [BPA] are not considered scientifically controversial and provide *clear evidence* of adverse effects on development in laboratory animals."  *NTP Draft Brief*, at 9.

17.      NTP also observed that a variety of effects related to neural and behavior alterations, precancerous lesions in the prostate and mammary glands, altered prostate gland and urinary tract development, and early onset of puberty in females have been reported in laboratory

6

rodents exposed during development to much lower doses of BPA that are more similar to human exposures.

18.    NTP concluded, in part, that current exposures to BPA are possibly high enough to cause concern:

> "The 'high' dose effects of [BPA] in laboratory animals that provide *clear evidence* for adverse effects on development, i.e., reduced survival, birth weight, and growth of offspring early in life, and delayed puberty in female rats and male rats and mice, are observed at levels of exposure that far exceed those encountered by humans. However, estimated exposures in pregnant women and fetuses, infants, and children are similar to levels of [BPA] associated with several 'low' dose laboratory animal findings of effects on the brain and behavior, prostate and mammary gland development, and early onset of puberty in females."

*NTP Draft Brief*, at 32.

19.    Some other important recent studies concerning BPA and its potential effects on human health are summarized below:

a.    Experiments with rats demonstrate that low level exposure to BPA during fetal growth causes breast cancer in adults. *See* Murray, T. J., et al., *Induction of mammary gland ductal hyperplasias and carcinoma in situ following fetal bisphenol A exposure*, Reproductive Toxicology 23: 383-390.

b.    *In utero* exposure to BPA causes long-term effects on mammary tissue development in rats, increasing risks to cancer, and also increases to a chemical known to cause breast cancer. *See* Durando, M., et al. *Prenatal Bispheno A Exposure Induces Preneoplastic Lesions in the Mammary Gland in Wistar Rats*, Environmental Health Perspectives 115, No. 1 (January 2007).

c.    Perinatal exposure to extremely low levels of BPA causes precancerous prostate lesions in rats. *See* Ho, S-M, et al., *Developmental Exposure to Estradiol and*

*Bisphenol A Increases Susceptibility to Prostate Carcinogenesis and Epigenetically Regulates Phosphodiesterase Type 4 Variant 4*, Cancer Research 66: 5624-5632.

d.    Experiments with mice reveal that chronic adult exposure to BPA causes insulin resistance. *See* Alonso-Magdalena, P., et al., *The Estrogenic Effect of Bisphenol-A Disrupts the Pancreatic B-Cell Function in vivo and Induces Insulin Resistance*, Environmental Health Perspectives 114:106-112.

e.    In a small prospective study, researchers in Japan report that BPA levels are higher in women with a history of repeated spontaneous miscarriages. *See* Sugiura-Ogasawara, M., et al., *Exposure to bisphenol A is associated with recurrent miscarriage*, Human Reproduction 20: 2325-2329.

f.    BPA and the birth control pharmaceutical ethinylestradiol cause adverse effects in prostate development in mice at levels to which millions of Americans are exposed each year. *See* Timms, B. G., et al., *Estrogenic chemicals in plastic and oral contraceptives disrupt development of the fetal mouse prostate and urethra*, Proceedings of the National Academy of Sciences, 10.1073/pnas.0502544102.

g.    A flood of new information about BPA revealing both widespread human exposure and effects at extremely low doses sparks a call for a new risk assessment of the compound. *See* vom Saal, F., et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment*, Environmental Health Perspectives 115:8 (August 2005).

h.    Several weakly estrogenic compounds including BPA are as powerful as estrogen at increasing calcium influx into cells and stimulating prolactin secretion. *See* Wozniak, A. L., et al., *Xenoestrogens at Picomolar to Nanomolar Concentrations*

8

*Trigger Membrane Estrogen Receptor-alpha-Mediated Ca++ Fluxes and Prolactin Release in GH3/B6 Pituitary Tumor Cells*, Environmental Health Perspectives 113:431-439.

i.       BPA at extremely low levels causes changes in brain structure and behavior in rats.  *See* Kubo, K., et al., *Low dose effects of bisphenol A on sexual differentiation of the brain and behavior in rats*, Neuroscience Research 45: 345-356.

j.       Exposures to 1/5[th] the level considered safe are sufficient to alter maternal behavior in mice.  *See* Palanza, P., et al, *Exposure to a low dose of bisphenol A during fetal life or in adulthood alters maternal behavior in mice*, Environmental Health Perspectives 110 (suppl 3): 415-422.

k.       An accident in the lab, followed by careful analysis and a series of experiments reveals that BPA causes aneuploidy in mice at low levels of exposure. Because aneuploidy in humans causes spontaneous miscarriages and some 10-20% of all birth defects, this implicates BPA in a broad range of human developmental errors.  *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse*, Current Biology 13: 546-553.

l.       Experiments by researchers at the University of Missouri raise the possibility of widespread contamination of laboratory experiments by BPA.  Their results demonstrate that at room temperature significant amounts of this estrogenic substance leach into water from old polycarbonate animal cages.  This inadvertent contamination could interfere with experiments designed to test the safety of estrogenic chemicals, and lead to false negatives and conflicting results.  *See* Howdeshell, K. A., et al., *Bisphenol A*

*is released from used polycarbonate animal cages into water at room temperature*, Environmental Health Perspectives doi:10.1289/ehp.5993.

m.    An analysis of the biochemical mechanisms of endocrine disruption suggests why industry has been unable to replicate crucial low-dose impacts of BPA on prostate development. *See* Welshons, W. V., et al., *Large effects from small exposures. I. Mechanisms for endocrine disrupting chemicals with estrogenic activity*, Environmental Health Perspects doi:10.1289/ehp.5494.

n.    Using new analytical methods, a team of German scientists measured BPA in the blood of pregnant women, in umbilical blood at birth and in placental tissue. All samples examined contained BPA, at levels within the range shown to alter development. Thus widespread exposure to BPA at levels of concern is no longer a hypothetical issue. *See* Schonfelder, G., et al., *Parent Bisphenol A Accumulation in the Human Maternal-Fetal-Placental Unit*, Environmental Health Perspectives 110:A703-A707.

o.    At extremely low levels, BPA promotes fat cell (adipocyte) differentiation and accumulation of lipids in a cell culture line used as a model for adipocyte formation. These two steps, differentiation and accumulation, are crucial in the development of human obesity. Hence this result opens up a whole new chapter in efforts to understand the origins of the world-wide obesity epidemic. *See* Masuno, H., et al., *Bisphenol A in combination with insulin can accelerate the conversion of 3T#-L1 fibroblasts to adipocytes*, Journal of Lipid Research 3:676-684.

p.    In cell culture experiments, BPA at very low (nanomolar levels) stimulates androgen-independent proliferation of prostate cancer cells. This finding is especially important because when prostate tumors become androgen-independent they no longer

respond to one of the key therapies for prostate cancer. *See* Wetherill, Y. B., et al., *The Xenoestrogen Bisphenol A Induces Inappropriate Androgen Receptor Activation and Mitogenesis in Prostatic Adenocarcinoma Cells*, Molecular Cancer Therapeutics 1: 515-524.

q.      BPA causes changes in rat ventral prostate cells that appear similar to events that make nascent prostate tumors in humans more potent. *See* Ramos, JG, et al., *Prenatal Exposure to Low Doses of Bisphol A Alters the Periductal Stroma and Glandular Cell Function in the Rat Ventral Prostate*, Biology of Reproduction 65: 1271-1277.

r.      BPA induces changes in mouse mammary tissue that resemble early stages mouse and human of breast cancer. *See* Markey, C. M., et al., *In Utero Exposure to Bisphenol A Alters the Development and Tissue Organization of the Mouse Mammary Gland*, Biology of Reproduction 65: 1215-1223.

s.      BPA lowers sperm count in adult rates even at extremely low levels. *See* Sakaue, M., et al., *Bisphenol-A Affects Spermatogenesis in the Adult Rat Even at a Low Dose*, Journal of Occupational Health 43: 185-190.

t.      BPA at extremely low levels creates superfemale snails. *See* Oehlmann, J., et al., *Effects of endocrine disruptors on Prosobranch snails (Mollusca:Gastropoda) in the laboratory. Part I: Bisphenol A and Octylphenol as xenoestrogens*, Exotoxicology 9: 383-397.

u.      BPA is rapidly transferred to the fetus after maternal intake. *See* Takahashi, O., et al., *Disposition of Orally Administered 2,2-Bis (4-hydroxyphenyl)*

*propane (Bisphenol A) in Pregnant Rats and the Placental Transfer to Fetuses*, Environmental Health Perspectives 108: 931-935.

v.    An independently funded academic laboratory can verify controversial BPA results, even though industry cannot. *See* Gupta, Chhanda, *Reproductive malformation of the male offspring following maternal exposure to estrogenic chemicals*, Proceedings of the Society for Experimental Biology and Medicine 224: 61-68.

w.    Metabolic differences between rats and humans probably mean that humans are more sensitive to BPA than are rats. *See* Elsby, R., et al., *Comparison of the modulatory effects of human and rat liver microsomal metabolism on the estrogenicity of bisphenol A: implications for extrapolation to humans*, Journal of Pharmacology and Experimental Therapeutics 297-103-113.

x.    A confirmation of BPA low dose effects, and demonstration that the effects include impacts on estrous cyclicity and plasma LH levels. *See* Rubin, B. S., et al., *Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels*, Environmental Health Perspectives 109: 675-680.

y.    BPA speeds the pace of sexual development in mice, and causes mice to be obese. *See* Hodeshell, K., et al., *Plastic bisphenol A speeds growth and puberty*, Nature 401: 762-764.

20.    Recently, and worthy of further highlight, on or about November 28-30, 2006, a National Institute of Health Funded Group (the "Group") consisting of 38 of the world's leading scientists with regard to Bisphenol-A, met at Chapel Hill, North Carolina to examine the relationship between BPA and the negative trends in human health that have occurred in recent

decades such as increases in abnormal penile/uretha development in males, early sexual maturation caused in females, increased neuron-behavioral problems such as ADHD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm court, and an increase in hormonally mediated cancers, such as prostate and breast cancers. Heightened concern was paid to the relationship between treatment with "low doses" of BPA and the many negative health outcomes confirmed by experimental studies in laboratory animals as well as in vitro studies that identified plausible molecular mechanisms responsible for mediating such effects.

21.     This eminent collection of scientists concluded that the wide range of adverse effects of low doses of BPA in laboratory animals exposed both during development and in adulthood "is a great cause for concern with regard to the potential for similar adverse effects in humans." The Group also concluded that recent trends in human diseases relate to adverse observed in experimental animals exposed to low doses of BPA, the specific examples of which include the conditions described in Paragraph 20.

22.     Furthermore, the Group concluded that there is extensive evidence documenting that negative health outcomes may not become apparent until long after BPA exposure during development has occurred – that the issue of a very long latency for effects *in utero* is well known and these developmental effects are irreversible and can occur due to low dose exposure during brief sensitive periods in development, even though BPA may not be detected when the damage or disease is expressed. Furthermore, the group's findings indicate that acute studies in animals, particularly traditional toxicological studies that only involve the use of high doses of BPA (like those relied upon by the chemical and plastic industries), do not reflect the situation in humans.

23.     Consistent with these well-accepted and well-founded conclusions as reached by the Group, the NTP found that the "possibility that bisphenol-a may alter human development cannot be dismissed." *NTP Draft Brief*, at 9.

24.     Given statements such as these, of immediate and urgent concern is BPA's toxicity and its link to serious and significant health problems, which pose a serious threat to Plaintiff's and the proposed Plaintiff Class' health; and, as in Plaintiff's case, the health of their infants and children.

**B.     Defendants' Wrongful Conduct.**

25.     During all times relevant hereto, and despite the well-documented scientific evidence discussed above, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using a dangerous chemical that has been known for years to be toxic in several respects and which poses serious hazards to an individuals' health. Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual health with no mention as to the potentially toxic substance the products contain.

26.     For example, Defendant Avent's business strategy seems to target consumers which are new and/or expecting parents by touting its products as superior, in terms of both healthiness and safety, when compared to other similar baby products. On its website, Defendant Avent boasts that it "has distinguished itself as a brand that marks the highest standard in infant feeding."

http://aventamerica.gsdesign.com/about/index.asp (May 6, 2008).

27.     In promoting the supposed health benefits associated with the use of Defendant Avent's polycarbonate bottle products, Defendant Avent's website boasts that "[o]ur award-

14

winning products are efficient, easy to use, and backed by clinical studies, and the reason Avent

is recommended by more doctors than any other brand. We are committed to making it easier for

parents to have flexible feeding choices while providing the best for their babies."

http://aventamerica.gsdesign.com/about/index.asp (May 6, 2008).

28.    Defendant Avent's labeling and packaging of its polycarbonate plastic bottle

products have made (and continue to make) similar claims.   Yet, while Defendant Avent's

labeling and packaging of its polycarbonate plastic bottle products have touted (and continues to

tout) the products' supposed health benefits, safeness, and overall superiority, the labeling and

packaging has not (and does not) sufficiently and/or adequately disclosed material information as

to the fact that its polycarbonate plastic bottle products are formulated with and/or contain BPA,

nor material information as to the potential health risks associated with polycarbonate plastic

bottle products and BPA as discussed above.

29.    Defendant Avent has failed (and continues to fail) to properly and adequately

disclose the risk of harm to Plaintiff and the proposed Plaintiff Class despite the fact that it knew,

or should have known, of the potential harm posed by its polycarbonate plastic bottle products,

which contain BPA.   The failure to disclose as described herein is a misrepresentation and

constitutes a deceptive and/or unfair trade practice consistent with applicable statutory and

common law.

30.    The polycarbonate plastic bottle products purchased by Plaintiff from Defendant

Avent are polycarbonate plastic bottle products that contain the dangerous chemical Bisphenol-

A.    Specifically, Plaintiff purchased 4 oz. and 8 oz. reusable baby bottles produced,

manufactured, distributed, and/or sold by Aventis.

15

31.    Plaintiff purchased Defendant Avent's polycarbonate plastic bottle products unaware that they were formulated with and/or contained BPA, a potentially toxic material, because Defendant Avent did not adequately disclose such information. Had she known, she would not have purchased Defendant Avent's polycarbonate plastic bottle products.

32.    Indeed, although consumers can try to avoid polycarbonate plastic bottle products, most (like Plaintiff) were/are simply unaware that a toxic chemical which acts like a female hormone can leach from these products and contaminate the liquid or food ingested by them, and/or more importantly, their children.

33.    This lack of consumer awareness is a direct result of the Defendant Avent's, and the other Defendants', efforts to perpetuate a very lucrative revenue stream that would be interrupted and reduced if the general public and persons similarly situated to Plaintiff were to learn the truth and seek safer alternatives.

## V.    CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23 are met with respect to the classes defined below.

### A.    The Plaintiff Class.

35.    Plaintiff brings her claim on her own behalf, and on behalf of the following class:

> All persons in the United States who, over the past five years, purchased polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendants and who were accordingly damaged thereby.

36.    Plaintiff reserves the right to amend or modify her Complaint and/or the Plaintiff Class definition in connection with meaningful discovery and/or a Motion for Class Certification.

37.    Members of the Plaintiff Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. The Plaintiff Class, upon information and belief, includes thousands if not hundreds of thousands of individuals geographically dispersed throughout the United States. The precise number and identities of Class members are unknown to Plaintiff but can be easily obtained through notice and discovery. Indeed, notice can be provided through a variety of means including publication, the cost of which is properly imposed upon the Defendant.

38.    Plaintiff will fairly and adequately protect the interests of all Plaintiff Class members and has retained counsel competent and experienced in class and consumer litigation.

39.    Plaintiff's claims are typical of the claims of the Plaintiff Class and all Plaintiff Class members sustained uniform damages arising out of the conduct challenged in this action. The Plaintiff Class is ascertainable and there is a well-defined community of interests in the questions of law and/or fact alleged since the rights of each Plaintiff Class member were infringed or violated in a similar fashion based upon the Defendants' wrongdoing. The injuries sustained by the Plaintiff and the Plaintiff Class members flow, in each instance, from a common nucleus of operative facts – the Defendant's wrongdoing. In every related case, Plaintiff and the Plaintiff Class members suffered uniform damages caused by their purchase of polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by the Defendants.

40.    There are questions of law and fact common to the Plaintiff Class that predominate over any questions solely affecting individual Plaintiff Class members. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Plaintiff Class members. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

41.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Plaintiff Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Plaintiff Class members to individually redress the wrongs done to them.

42.     Defendants have acted or have refused to act on grounds generally applicable to the Plaintiff Class thereby making it appropriate to grant final declaratory and injunctive relief with respect to the Plaintiff Class as a whole.

**B.     The Defendant Class.**

43.     Defendant Avent is sued herein individually and as the representative of the Defendant Class described above consisting of all producers, manufacturers, and/or otherwise distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A.

44.     The Defendant Class is composed of numerous companies substantially similar to Defendant Avent; so much so that joinder of all of the Defendants as named defendants would impracticable.

45.     The claims and defenses of Defendant Avent are typical of the claims and defenses of the other Defendants, and Defendant Avent will fairly and adequately protect the interests of all other members of the Defendant Class.

46.     There are questions of law and fact common to the members of the Defendant Class that predominate over any individual questions affecting individual Defendants.

47.     Prosecution of separate actions by individual members of the Defendant Class would create a risk of inconsistent or varying adjudications with respect to individual members

18

of the proposed class, which would establish incompatible standards of conduct for the Defendants.

48.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Individual members of the Defendant Class do not have a great interest in individually controlling the defense of separate actions.   Further, many of the members of the proposed Defendant Class do not have individual defenses to this action, and any core ruling or precedent affecting the named Defendants would be equally applicable to all members of the Defendant Class.

49.     Concentrating this litigation is one forum is desirable, because it would greatly conserve judicial resources and provide for the expedient and efficient resolution of the claims asserted herein.

50.     This proposed class action does not present any extraordinary or unusual difficulties affecting its management as a class action.  Plaintiff knows of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Indeed, it would be the most appropriate structure of litigation.

## VI.   CAUSES OF ACTION

### COUNT I: *VIOLATIONS OF THE*
*ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT*

51.     Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

52.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), 815 Illinois Compiled Statute ("Ill. Comp. Stat.") § 505/1 *et seq.*, is a remedial statute designed to protect consumers from deceptive, unfair, and unconscionable trade practices.

19

53.     As set forth herein, Defendants have violated provisions of the Act because they have utilized unfair and/or deceptive acts and practices, including but not limited to the use or employment of deception, fraud, false pretense, false promise, misrepresentation and/or the concealment, suppression and/or omission of material facts, with the intent that others rely upon the concealment, suppression and/or omission of such material facts, in their commercial and business practices relating to their polycarbonate plastic bottle products.

54.     As set forth herein, Defendants have also violated provisions of the Act because they have used and/or employed practices described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965 [815 Ill. Comp. Stat. § 510/2] in their commercial and business practices.  Specifically, Defendants have (1) represented that their polycarbonate plastic bottle products are of a particular standard, quality, or grade though they are of another; (2) advertised their polycarbonate plastic bottle products with the intent not to sell them as advertised; and/or (3) engaged in conduct which similarly creates the likelihood for confusion and/or misunderstanding.

55.     Defendants have engaged in unconscionable, false, and/or deceptive acts in their commercial and business practices.  Through their marketing and sales practices associated with their polycarbonate plastic bottle products, Defendants unfairly and deceptively misled their eventual customers by misrepresenting their products as safe and/or failing to disclose the risks, or potential risks of harm posed by their products.

56.     In light of Defendants' misrepresentations and Defendants' failure to disclose, or clearly and conspicuously disclose, all material information related to their polycarbonate plastic bottle products, Defendants have used deception, fraud and/or false pretenses to sell their polycarbonate plastic bottle products, and Defendants concealed, suppressed and omitted

material facts surrounding their polycarbonate plastic bottle products with the intent that others rely upon the concealment, suppression, and omission.

57. Defendants' acts or practices in marketing and/or selling its polycarbonate plastic bottle products through the use of deceptive and unfair business practices offends established public policy and is unethical, oppressive, unscrupulous or substantially injurious to consumers. The deceptive trade practices described above significantly impact the public as actual or potential consumers of Defendants' goods.

58. Defendants' unfair and deceptive trade practices, amounting to violations of the Act, proximately caused damage to Plaintiff and the Plaintiff Class members.

59. Accordingly, consistent with the remedial provisions of the Act, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

### COUNT II: *STRICT PRODUCTS LIABILITY – DEFECT IN DESIGN OR MANUFACTURE*

60. Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

61. Defendants, as commercial suppliers of polycarbonate plastic bottle products, have an absolute duty to refrain from placing into the stream of commerce an unreasonably dangerous product that is not fit for consumption or use which can cause injury to person or property.

62. Defendants breached that duty (and continue to breach that duty) by placing into the stream of commerce unreasonably dangerous products that are not fit for consumption or use which has caused injury to both persons and property. These products were unreasonably dangerous because they contained manufacturing and/or design defects.

21

63.    The unreasonably dangerous products Defendants placed into the stream of commerce reached consumers such as Plaintiff and the Plaintiff Class members without substantial change in the condition in which they were was supplied.

64.    Plaintiff and the Plaintiff Class members were reasonably foreseeable users of Defendants' unreasonably dangerous products and used these unreasonably dangerous products in a foreseeable manner. As a result, they have suffered significant damages caused directly and proximately by their use of Defendants' unreasonably dangerous products.

65.    Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

### COUNT III: *STRICT PRODUCTS LIABILITY – FAILURE TO WARN*

66.    Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

67.    Defendants have placed into the stream of commerce unreasonably dangerous products that are not fit for consumption or use and which can cause injury to person or property.

68.    Simultaneously, Defendants have also failed to warn the reasonably foreseeable users of their products, including Plaintiff and the Plaintiff Class members, of the known dangers associated with their unreasonably dangerous products despite the fact that Defendants knew, or should have known, of the known dangers associated with their unreasonably dangerous products. Even after Defendants became, or should have become, aware of the dangerous condition of their products; they still refused to investigate potential problems in a reasonable manner and failed to warn consumers of these potential problems thereby allowing countless other consumers to purchase the unreasonably dangerous products.

22

69.     As a direct and proximate result of Defendants' actions, Plaintiff and the Plaintiff

Class members have suffered significant damages.

70.     Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the

Defendants for their actual damages in the form of restitution, attorneys' fees and costs of

litigation.

**COUNT IV:** *BREACH OF IMPLIED WARRANTY –*
*FITNESS FOR PURPOSE*

71.     Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth

herein.

72.     Plaintiff, and the members of the Plaintiff Class, sought to purchase safe, reusable

beverage containers.  In doing so, Plaintiff and the members of the Plaintiff Class relied on

Defendants' skill and judgment to select and furnish suitable goods for that purpose; on or about

the time Defendants sold to Plaintiff and the Plaintiff Class members their polycarbonate plastic

bottle products.

73.     By the acts set forth in detail above, Defendants warranted that the polycarbonate

plastic bottle products were safe, but intentionally omitted, suppressed, and withheld material

information regarding risks associated with BPA found in their products.  Plaintiff and the

members of the Plaintiff Class bought Defendants' polycarbonate plastic bottle products relying

on Defendants' skill, judgment and representations.  However, Defendants' polycarbonate plastic

bottle products are not free from risk from harmful exposure to BPA, as set forth in detail above.

74.     At the time of the sale(s), Defendants had reason to know the particular purpose

for which their goods were being offered and acquired, and that Plaintiff and the members of the

Plaintiff Class were relying on Defendants' skill and judgment to select and furnish suitable and

23

safe goods for that purpose. Accordingly, there was an implied warranty that the goods were fit for this purpose.

75.     However, Defendants breached this warranty implied at the time of sale by providing goods that are/were unsuitable for the purpose for which they were made and purchased because the polycarbonate plastic bottle products sold were not free from risk of harmful exposure to BPA as discussed above.

76.     As a direct and proximate result of Defendants' actions, Plaintiff and the Plaintiff Class members have suffered significant damages.

77.     Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

## VII.    JURY TRIAL DEMANDED

78.     Plaintiff and the proposed Plaintiff Class demand a jury of twelve.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated; request that she and the other applicable Plaintiff Class members have judgment entered in their favor and against Defendants, as follows:

A.     An order certifying that this action, involving Plaintiff's and the Plaintiff Class members' claims against Defendant Avent and the Defendant Class be maintained as a nationwide class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and their undersigned counsel to represent the Plaintiff Class;

B.     An award of actual damages in the form of restitution;

24

C.    Appropriate injunctive relief;

D.    Reasonable attorneys' fees and costs; and

E.    Such further appropriate relief this Court deems necessary.


DATED:    May 6, 2008            **LASKY & RIFKIND**


          __/s/ Norman Rifkind_____

          Norman Rifkind
          Leigh R. Lasky
          Amelia S. Newton
          350 North LaSalle Street, Suite 1320
          Chicago, IL 60610
          Telephone: (312) 634-0057
          *(Local Counsel for Plaintiff)*

          EMERSON POYNTER LLP
          Scott E. Poynter
          Email: scott@emersonpoynter.com
          Christopher D. Jennings
          Email: cjennings@emersonpoynter.com
          Gina M. Cothern
          Email: gcothern@emersonpoynter.com
          The Museum Center
          500 President Clinton Ave., Ste. 305
          Little Rock, AR 72201
          Telephone: (501) 907-2555
          Facsimile: (501) 907-2556

          John G. Emerson
          Email: jemerson@emersonpoynter.com
          830 Apollo Lane
          Houston, TX 77058
          Phone: (281) 488-8854
          Fax: (281) 488-8867

          WHATLEY DRAKE & KALLAS, LLC
          Joe R. Whatley, Jr.


25

Email: jwhatley@wdklaw.com
Edith M. Kallas
Email: ekallas@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Facsimile: (212) 447-7077

***Counsel for Plaintiff***

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **TOM BRADY**, *individually, and on behalf of all other similarly situated persons,* | ) ) ) | FILED: JULY 23, 2008 |
| Plaintiff, | ) ) | 08CV4189 |
| v. | ) ) | JUDGE LEFKOW<br>MAGISTRATE VALDEZ<br>NF |
| **AVENT AMERICA, INC.,** *on behalf of itself and on behalf of a Defendant Class of producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A,* | ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiff TOM BRADY ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint (the "Complaint") and alleges upon personal knowledge matters pertaining to himself and his own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by his counsel:

## I. SUMMARY OF THE ACTION

1.     This is a nationwide class action lawsuit brought on behalf of Plaintiff and other similarly situated individuals (the "Plaintiffs" and the "Plaintiff Class") against Avent America, Inc. ("Defendant Avent"), individually, and as the representative of a Defendant class (the "Defendants" and the "Defendant Class") comprised of all entities which produce, manufacture, and/or otherwise distribute polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A ("BPA") that have been subsequently purchased by Plaintiffs. Specifically, Plaintiff brings this action on behalf of those who, over the past five years, purchased polycarbonate plastic bottle products containing BPA that were produced, manufactured, distributed, and/or sold by the Defendants and who were accordingly damaged thereby.

2.      BPA, a chemical which Defendants use to make their polycarbonate plastic bottle products, is a dangerous chemical that has been linked to serious human health problems. Numerous studies and papers over the past several years, including very recent reports, have repeatedly shown that BPA can be toxic to humans even at extremely low doses. Recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

3.      Yet, as alleged more fully below, despite this well-documented scientific evidence, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using this dangerous chemical which has been known for years to be toxic in several respects and which poses serious hazards to individuals' health.

4.      Defendants have breached (and continue to breach) their duty to adequately disclose relevant and appropriate information regarding BPA in the marketing and sale of their polycarbonate plastic bottle products.

## II.  PARTIES

5.      Plaintiff is a resident of the state of Illinois. Plaintiff purchased polycarbonate plastic bottle products containing BPA and bearing the mark of Defendant Avent.

6.      Defendant Avent America, Inc. is an Illinois Corporation with its principal offices located in Bensenville, Illinois. Defendant Avent produces, manufactures, distributes, and/or sells an array of polycarbonate plastic bottle products, which are primarily baby bottles and baby bottle accessories.

## III. JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d). The Plaintiff Class involves more than 100 individuals. A member of the

Plaintiff Class is a citizen of a state different from the Defendants, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000.00 exclusive of interest and costs.

8.    Venue is proper in this district under 28 U.S.C. §1391. Defendant Avent is incorporated under the laws of the State of Illinois; has availed itself to the laws and protection of the State of Illinois; markets and sales plastic bottle products here; and has its principal offices in this District.

## IV. FACTUAL ALLEGATIONS

### A.    Bisphenol A, Its Uses, And Actual/Potential Health Risks.

9.    As discussed above, this action concerns potentially toxic material used in polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by Defendants. The potentially toxic material, otherwise known as the industrial chemical Bisphenol-A (2, 2-bis (4-hydroxyphenly)-propane, hereinafter referred to as "BPA"), is currently used as a primary monomer[1] in polycarbonate plastic and epoxy resins.[2]

10.    BPA is a fundamental building block in polycarbonate plastics that are widely used in a myriad of consumer products — from mostly clear plastic baby bottles, training or spill-proof cups, and reusable drink containers (like those produced, manufactured, distributed, and/or sold by Defendants and purchased by Plaintiff) to children's toys, microwavable food containers, beverage cans with epoxy linings, and hundreds of other products that consumers come into contact with every day.

11.    Although the strong polycarbonate plastic that BPA is used for appears indestructible and safe, unfortunately the material is dangerously flawed in a manner

---

[1] A monomer is a small molecule that may become chemically bonded to other monomers to form a polymer. A polymer is a substance composed of molecules with large molecular mass consisting of repeating structural units, or monomers, connected by covalent chemical bonds. The individual molecules that comprise a polymer are referred to as polymer molecules. In popular usage, the term "polymer" is used as a synonym for plastic.
[2] Epoxy resins are polyether resins formed originally by the polymerization of Bisphenol-A and epichlorohydrin, having

3

undetectable to the human eye. The ester bond that links BPA monomers to one another to form

polymer chains is not stable, and thus the polymer decays with time. When liquid or food comes

into contact with the decayed area, BPA is released into the liquid or food and ingested by the

consumer. This leaching of BPA from the plastic into the liquid or food is accelerated when

these bottles are subjected to heat such as when the bottle is microwaved.

12.     The extreme cause for concern is that, for many years, scientists have commented

on, and been very troubled with, the harmful effects of BPA on human health. Numerous studies

and papers have repeatedly shown that BPA can be toxic even at extremely low doses and recent

studies on lab animals have confirmed significant health risks associated with exposure to very

low levels of BPA, and in particular, its estrogenic effect.

13.     Most recently, in April 2008, the National Toxicology Program ("NTP") issued a

draft brief prepared by the NTP Center for the Evaluation of Risks to Human Reproduction

("CERHR") titled *DRAFT NTP BRIEF ON BISPHENOL A* (hereafter "NTP Draft Brief") that

discusses the chemical, human exposure, and whether BPA can affect human development or

reproduction.

14.     The salient points about what BPA is and its uses are summarized below:

    a.  BPA is a high production volume chemical that is widely used in the
        manufacture of polycarbonate plastics and epoxy resins;

    b.  Polycarbonate plastics have many applications including use in certain
        food and drink packaging, e.g., water and infant bottles, compact discs,
        impact-resistant safety equipment, and medical devices;

    c.  Polycarbonate plastics are typically clear and hard and marked with the
        recycle symbol "7" or may contain the letters "PC" near the recycle
        symbol; and

    d.  Epoxy resins are used as lacquers to coat metal products such as food
        cans, bottle tops, and water supply pipes.

high strength, and low shrinkage during curing and can be used as a coating, adhesive, casting, or foam.

15.    NTP also explains how humans come into contact with BPA:

The primary source of exposure to BPA for most people is through the diet, in food and beverages;

    a.  BPA can migrate into food from food and beverage containers with internal epoxy resin coatings and from consumer products made of polycarbonate plastic such as baby bottles, tableware, food containers, and water bottles;

    b.  The highest estimated intakes of BPA in the general population occur in infants and children. Infants and children have higher intakes of many widely detected environmental chemicals because they eat, drink, and breathe more than adults on a pound for pound basis. In addition, infants and children spend more time on the floor than adults and may engage in certain behaviors, such as dirt ingestion or mouthing of plastic items that can increase the potential for exposure; and

    c.  Biomonitoring studies show that human exposure to BPA is widespread. The 2003 — 2004 National Health and Nutrition Examination Survey (NHANES III) conducted by the Centers for Disease Control and Prevention (CDC) found detectable levels of BPA in 93% of 2,517 urine samples from people 6 years and older. This study did not include children younger than 6 years of age. The CDC NHANES data are considered representative of exposures in the United States because of the large number of people included in the survey and the process used to select participants. In addition, the analytical techniques used by the CDC to measure BPA are considered very accurate by the scientific community.

16.    NTP observed that studies with laboratory rodents show that exposure to high dose levels of BPA during pregnancy and/or lactation can reduce survival, birth weight, and growth of offspring early in life, and delay the onset of puberty in males and females. "These `high' dose effects of [BPA] are not considered scientifically controversial and provide *clear evidence* of adverse effects on development in laboratory animals." *NTP Draft Brief,* at 9.

17.    NTP also observed that a variety of effects related to neural and behavior alterations, precancerous lesions in the prostate and mammary glands, altered prostate gland and urinary tract development, and early onset of puberty in females have been reported in laboratory rodents exposed during development to much lower doses of BPA that are more  similar to

5

human exposures.

18.     NTP concluded, in part, that current exposures to BPA are possibly high enough

to cause concern:

> rodents exposed during development to much lower doses of BPA that are more
> similar to human exposures.

19.     NTP concluded, in part, that current exposures to BPA are possibly high enough

to cause concern:

> "The 'high' dose effects of [BPA] in laboratory animals that provide *clear
> evidence* for adverse effects on development, i.e., reduced survival, birth weight,
> and growth of offspring early in life, and delayed puberty in female rats and male
> rats and mice, are observed at levels of exposure that far exceed those
> encountered by humans. However, estimated exposures in pregnant women and
> fetuses, infants, and children are similar to levels of [BPA] associated with several
> `low' dose laboratory animal findings of effects on the brain and behavior,
> prostate and mammary gland development, and early onset of puberty in
> females."
> *NTP Draft Brief,* at 32.

20.     Some other important recent studies concerning BPA and its potential effects on

human health are summarized below:

> a.    Experiments with rats demonstrate that low level exposure to BPA during
> fetal growth causes breast cancer in adults. See Murray, T. J., et al.,
> *Induction of mammary gland ductal hyperplasias and carcinoma in situ
> following fetal bisphenol A exposure,* Reproductive Toxicology 23: 383-
> 390.
>
> b.    *In utero* exposure to BPA causes long-term effects on mammary tissue
> development in rats, increasing risks to cancer, and also increases to a
> chemical known to cause breast cancer. *See* Durando, M., et al. *Prenatal
> Bisphenol A Exposure Induces Preneoplastic Lesions in the Mammary
> Gland in Wistar Rats,* Environmental Health Perspectives 115, No. 1
> (January 2007).
>
> c.    Perinatal exposure to extremely low levels of BPA causes precancerous
> prostate lesions in rats. See Ho, S-M, et al., *Developmental Exposure to
> Estradiol and Bisphenol A Increases Susceptibility to Prostate
> Carcinogenesis and Epigenetically Regulates Phosphodiesterase Type 4
> Variant 4,* Cancer Research 66: 5624-5632.

d. Experiments with mice reveal that chronic adult exposure to BPA causes insulin resistance. *See* Alonso-Magdalena, P., et al., *The Estrogenic Effect of Bisphenol-A Disrupts the Pancreatic β-Cell Function in vivo and Induces Insulin Resistance,* Environmental Health Perspectives 114:106-112.

e. In a small prospective study, researchers in Japan report that BPA levels are higher in women with a history of repeated spontaneous miscarriages. *See* Sugiura-Ogasawara, M., et al., *Exposure to bisphenol A is associated with recurrent miscarriage,* Human Reproduction 20: 2325-2329.

f. BPA and the birth control pharmaceutical ethinylestradiol cause adverse effects in prostate development in mice at levels to which millions of Americans are exposed each year. *See* Timms, B. G., et al., *Estrogenic chemicals in plastic and oral contraceptives disrupt development of the fetal mouse prostate and urethra,* Proceedings of the National Academy of Sciences 102: 7014-7019.

g. A flood of new information about BPA revealing both widespread human exposure and effects at extremely low doses sparks a call for a new risk assessment of the compound. *See* vom Saal, F., et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment,* Environmental Health Perspectives 113:926-933.

h. Several weakly estrogenic compounds including BPA are as powerful as estrogen at increasing calcium influx into cells and stimulating prolactin secretion. *See* Wozniak, A. L., et al., *Xenoestrogens at Picomolar to Nanomolar Concentrations Trigger Membrane Estrogen Receptor-α-Mediated $Ca^{2+}$ Fluxes and Prolactin Release in GH3/B6 Pituitary Tumor Cells,* Environmental Health Perspectives 113:431-439.

i. Exposures to 1[15th] the level considered safe are sufficient to *alter* maternal behavior in mice. *See* Palanza, P., et al, *Exposure to a low dose of bisphenol A during fetal life or in adulthood alters maternal behavior in mice,* Environmental Health Perspectives 110 (suppl 3): 415-422.

j. An accident in the lab, followed by careful analysis and a series of experiments reveals that BPA causes aneuploidy in mice at low levels of exposure. Because aneuploidy in humans causes spontaneous miscarriages and some 10-20% of all birth defects, this implicates BPA in a broad range of human developmental errors. *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse,* Current Biology 13: 546-553.

k. Experiments by researchers at the University of Missouri raise the possibility of widespread contamination of laboratory experiments by BPA. Their results demonstrate that at room temperature significant

7

amounts of this estrogenic substance leach into water from old polycarbonate animal cages. This inadvertent contamination could interfere with experiments designed to test the safety of estrogenic chemicals, and lead to false negatives and conflicting results. *See* Howdeshell, K. A., et al., *Bisphenol A is released from used polycarbonate animal cages into water at room temperature,* Environmental Health Perspectives 111:1180-1187.

l.  An analysis of the biochemical mechanisms of endocrine disruption suggests why industry has been unable to replicate crucial low-dose impacts of BPA on prostate development. *See* Welshons, W. V., et al., *Large effects from small exposures. I. Mechanisms for endocrine disrupting chemicals with estrogenic activity,* Environmental Health Perspects 111:994-1006.

m.  Using new analytical methods, a team of German scientists measured BPA in the blood of pregnant women, in umbilical blood at birth and in placental tissue. All samples examined contained BPA, at levels within the range shown to alter development. Thus widespread exposure to BPA at levels of concern is no longer a hypothetical issue. *See* Schonfelder, G., et al., *Parent Bisphenol A Accumulation in the Human Maternal-Fetal-Placental Unit,* Environmental Health Perspectives 110:A703-A707.

n.  At extremely low levels, BPA promotes fat cell (adipocyte) differentiation and accumulation of lipids in a cell culture line used as a model for adipocyte formation. These two steps, differentiation and accumulation, are crucial in the development of human obesity. Hence this result opens up a whole new chapter in efforts to understand the origins of the world-wide obesity epidemic. *See* Masuno, H., et al., *Bisphenol A in combination with insulin can accelerate the conversion of 3T3-L1 fibroblasts to adipocytes,* Journal of Lipid Research 43:676-684.

o.  In cell culture experiments, BPA at very low (nanomolar levels) stimulates androgen-independent proliferation of prostate cancer cells. This finding is especially important because when prostate tumors become androgen-independent they no longer respond to one of the key therapies for prostate cancer. *See* Wetherill, Y. B., et al., *The Xenoestrogen Bisphenol A Induces Inappropriate Androgen Receptor Activation and Mitogenesis in Prostatic Adenocarcinoma Cells,* Molecular Cancer Therapeutics 1: 515-524.

p.  BPA causes changes in rat ventral prostate cells that appear similar to events that make nascent prostate tumors in humans more potent. *See* Ramos, J.G., et al., *Prenatal Exposure to Low Doses of Bisphenol A Alters the Periductal Stroma and Glandular Cell Function in the Rat Ventral Prostate,* Biology of Reproduction 65: 1271- 1277.

q.  BPA induces changes in mouse mammary tissue that resemble early stages mouse and human of breast cancer. *See* Markey, C. M., et al., *In Utero*

*Exposure to Bisphenol A Alters the Development and Tissue Organization of the Mouse Mammary Gland,* Biology of Reproduction 65: 1215-1223.

r.  BPA lowers sperm count in adult rates even at extremely low levels. *See* Sakaue, M., et al., *Bisphenol-A Affects Spermatogenesis in the Adult Rat Even at a Low Dose,* Journal of Occupational Health 43: 185-190.

s.  BPA is rapidly transferred to the fetus after maternal intake. *See* Takahashi, O., et al., *Disposition of Orally Administered 2,2-Bis (4-hydroxyphenyl) propane (Bisphenol A) in Pregnant Rats and the Placental Transfer to Fetuses,* Environmental Health Perspectives 108: 931-935.

t.  An independently funded academic laboratory can verify controversial BPA results, even though industry cannot. *See* Gupta, Chhanda, *Reproductive malformation of the male offspring following maternal exposure to estrogenic chemicals,* Experimental Biology and Medicine 224: 61-68.

u.  Metabolic differences between rats and humans probably mean that humans are more sensitive to BPA than are rats. *See* Elsby, R., et al., *Comparison of the modulatory effects of human and rat liver microsomal metabolism on the estrogenicity of bisphenol A: implications for extrapolation to humans,* Journal of Pharmacology and Experimental Therapeutics 297:103-113.

v.  A confirmation of BPA low dose effects, and demonstration that the effects include impacts on estrous cyclicity and plasma LH levels. *See* Rubin, B. S., et *al., Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels,* Environmental Health Perspectives 109: 675-680.

21.    Recently, and worthy of further highlight, on or about November 28-30, 2006, a National Institute of Health Funded Group (the "Group") consisting of 38 of the world's leading scientists with regard to Bisphenol-A, met at Chapel Hill, North Carolina to examine the relationship between BPA and the negative trends in human health that have occurred in recent decades such as increases in abnormal penile/uretha development in males, early sexual maturation caused in females, increased neuron-behavioral problems such as ADHD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm court, and an increase in honnonally mediated cancers, such as prostate and breast cancers. Heightened concern was paid to the relationship between treatment with "low doses" of BPA and the many

9

negative health outcomes confirmed by experimental studies in laboratory animals as well as in vitro studies that identified plausible molecular mechanisms responsible for mediating such effects.

22.    This eminent collection of scientists concluded that the wide range of adverse effects of low doses of BPA in laboratory animals exposed both during development and in adulthood "is a great cause for concern with regard to the potential for similar adverse effects in humans." The Group also concluded that recent trends in human diseases relate to adverse observed in experimental animals exposed to low doses of BPA, the specific examples of which include the conditions described in Paragraph 21.

23.    Furthermore, the Group concluded that there is extensive evidence documenting that negative health outcomes may not become apparent until long after BPA exposure during development has occurred — that the issue of a very long latency for effects in utero is well known and these developmental effects are irreversible and can occur due to low dose exposure during brief sensitive periods in development, even though BPA may not be detected when the damage or disease is expressed. Furthermore, the group's findings indicate that acute studies in animals, particularly traditional toxicological studies that only involve the use of high doses of BPA (like those relied upon by the chemical and plastic industries), do not reflect the situation in humans.

24.    Consistent with these well-accepted and well-founded conclusions as reached by the Group, the NTP found that the "possibility that bisphenol-a may alter human development cannot be dismissed." *NTP Draft Brief,* at 9.

25.    Given statements such as these, of immediate and urgent concern is BPA's toxicity and its link to serious and significant health problems, which pose a serious threat to Plaintiff's and the proposed Plaintiff Class' health; and, as in Plaintiff's case, the health of his

infants and children.

**B.    Defendants' Wrongful Conduct.**

26.    During all times relevant hereto, and despite the well-documented scientific evidence discussed above, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using a dangerous chemical that has been known for years to be toxic in several respects and which poses serious hazards to an individuals' health. Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual health with no mention as to the potentially toxic substance the products contain.  For example, Defendant Avent's business strategy seems to target consumers which are new and/or expecting parents by touting its products as superior, in terms of both healthiness and safety, when compared to other similar baby products. On its website, Defendant Avent boasts that it has "set the standard for feeding bottles worldwide."

http://www.consumer.philips.com/consumer/en/us/consumer/cc/_categoryid_PHILIPS_AVENT _STORY_AR_US_CONSUMER/ (July 22, 2008).

27.    Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have made (and continue to make) similar claims. Yet, while Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have touted (and continues to tout) the products' supposed health benefits, safeness, and overall superiority, the labeling and packaging has not (and does not) sufficiently and/or adequately disclosed material information as to the fact that its polycarbonate plastic bottle products are formulated with and/or contain BPA, nor material information as to the potential health risks associated with polycarbonate plastic bottle products and BPA as discussed above.

28.    Defendant Avent has failed (and continues to fail) to properly and adequately

11

disclose the risk of harm to Plaintiff and the proposed Plaintiff Class despite the fact that it knew, or should have known, of the potential harm posed by its polycarbonate plastic bottle products, which contain BPA. The failure to disclose as described herein is a misrepresentation and constitutes a deceptive and/or unfair trade practice consistent with applicable statutory and common law.

29.    The polycarbonate plastic bottle products purchased by Plaintiff from Defendant Avent are polycarbonate plastic bottle products that contain the dangerous chemical Bisphenol-A. Specifically, Plaintiff purchased 4 oz. and 8 oz. reusable baby bottles produced, manufactured, distributed, and/or sold by Avent.

30.    Plaintiff purchased Defendant Avent's polycarbonate plastic bottle products unaware that they were formulated with and/or contained BPA, a potentially toxic material, because Defendant Avent did not adequately disclose such information. Had he known, he would not have purchased Defendant Avent's polycarbonate plastic bottle products.

31.    Indeed, although consumers can try to avoid polycarbonate plastic bottle products, most (like Plaintiff) were/are simply unaware that a toxic chemical which acts like a female hormone can leach from these products and contaminate the liquid or food ingested by them, and/or more importantly, their children.

32.    This lack of consumer awareness is a direct result of the Defendant Avent's, and the other Defendants', efforts to perpetuate a very lucrative revenue stream that would be interrupted and reduced if the general public and persons similarly situated to Plaintiff were to learn the truth and seek safer alternatives.

### V. CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23 are met with respect to the classes defined below.

A.    **The Plaintiff Class.**

34.    Plaintiff brings his claim on his own behalf, and on behalf of the following class:

> All persons in the United States who, over the past five years, purchased polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendants and who were accordingly damaged thereby.

35.    Plaintiff reserves the right to amend or modify his Complaint and/or the Plaintiff

Class definition in connection with meaningful discovery and/or a Motion for Class

Certification.

36.    Members of the Plaintiff Class are so numerous and geographically dispersed that

joinder of all Class members is impracticable. The Plaintiff Class, upon information and belief,

includes thousands if not hundreds of thousands of individuals geographically dispersed

throughout the United States. The precise number and identities of Class members are unknown

to Plaintiff but can be easily obtained through notice and discovery. Indeed, notice can be

provided through a variety of means including publication, the cost of which is properly imposed

upon the Defendant.

37.    Plaintiff will fairly and adequately protect the interests of all Plaintiff Class

members and has retained counsel competent and experienced in class and consumer litigation.

38.    Plaintiff's claims are typical of the claims of the Plaintiff Class and all Plaintiff

Class members sustained uniform damages arising out of the conduct challenged in this action.

The Plaintiff Class is ascertainable and there is a well-defined community of interests in the

questions of law and/or fact alleged since the rights of each Plaintiff Class member were

infringed or violated in a similar fashion based upon the Defendants' wrongdoing. The injuries

sustained by the Plaintiff and the Plaintiff Class members flow, in each instance, from a common

nucleus of operative facts — the Defendant's wrongdoing. In every related case, Plaintiff and the

Plaintiff Class members suffered uniform damages caused by their purchase of polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by the Defendants.

39.     There are questions of law and fact common to the Plaintiff Class that predominate over any questions solely affecting individual Plaintiff Class members. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Plaintiff Class members. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

40.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Plaintiff Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Plaintiff Class members to individually redress the wrongs done to them.

41.     Defendants have acted or have refused to act on grounds generally applicable to the Plaintiff Class thereby making it appropriate to grant final declaratory and injunctive relief with respect to the Plaintiff Class as a whole.

**B.     The Defendant Class.**

42.     Defendant Avent is sued herein individually and as the representative of the Defendant Class described above consisting of all producers, manufacturers, and/or otherwise distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A.

43.     The Defendant Class is composed of numerous companies substantially similar to Defendant Avent; so much so that joinder of all of the Defendants as named defendants would impracticable.

44.     The claims and defenses of Defendant Avent are typical of the claims and defenses of the other Defendants, and Defendant Avent will fairly and adequately protect the

interests of all other members of the Defendant Class.

45.    There are questions of law and fact common to the members of the Defendant Class that predominate over any individual questions affecting individual Defendants.

46.    Prosecution of separate actions by individual members of the Defendant Class would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed class, which would establish incompatible standards of conduct for the Defendants.

47.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual members of the Defendant Class do not have a great interest in individually controlling the defense of separate actions. Further, many of the members of the proposed Defendant Class do not have individual defenses to this action, and any core ruling or precedent affecting the named Defendants would be equally applicable to all members of the Defendant Class.

48.    Concentrating this litigation is one forum is desirable, because it would greatly conserve judicial resources and provide for the expedient and efficient resolution of the claims asserted herein.

49.    This proposed class action does not present any extraordinary or unusual difficulties affecting its management as a class action. Plaintiff knows of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Indeed, it would be the most appropriate structure of litigation.

## VI. CAUSES OF ACTION

A.     **CONSUMER PROTECTION LAWS ON BEHALF OF NATIONWIDE CLASS**

1.     **COUNT I:  FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*
BASED UPON OMISSION OR CONCEALMENT**

50.     Count I is brought by Plaintiff, individually and on behalf of the Class.  Plaintiff

incorporates by reference all other paragraphs of this complaint as if fully set forth here.

51.     Defendants engaged in unfair and/or deceptive acts and practices by, among other

things, concealing, suppressing, omitting or failing to inform Plaintiff and members of the Class,

that their polycarbonate bottles contain BPA.

52.     Upon information and belief, Defendants knew or should have known of the

harmfulness of BPA contained in their products, but did not disclose the information to Plaintiff

and members of the Class.

53.     Defendants intended that Plaintiff and the members of the Class rely on their

omissions and concealment of material facts regarding the polycarbonate bottles and the risk it

posed by containing BPA, and Plaintiff and the members of the Class were actually deceived by

Defendants' omissions and concealment as it portrayed that the bottles were safe for use.

54.     If not for Defendants' deceptive and unfair act of failing to inform Plaintiff and

the members of the Class as to the risk posed by the BPA in the polycarbonate bottles, Plaintiff

and members of the Class would not have purchased or used the bottles.

55.     Defendants were able to sell millions of products that they could not have sold

absent their deceptive marketing campaign, causing the Plaintiff and members of the Class

substantial injuries.

16

56.    The acts, practices, misrepresentations and omissions by Defendants described above, with intent that Plaintiff and other members of the Class rely upon the concealment, suppression and omission of such material facts, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq*.

57.    Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers.

58.    Plaintiff and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.  Accordingly, Plaintiff, on behalf of himself and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

**2.    COUNT II: FOR VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*, BASED UPON MISREPRESENTATIONS**

59.    Count II is brought by all Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

60.    Defendants engaged in unfair and/or deceptive acts and practices by, among other things, the dissemination of deceptive and misleading advertising and marketing materials stating that their polycarbonate bottles were safe for use.

61.    Upon information and belief, Defendants knew or should have known of the harmfulness of BPA contained in their products, but did not disclose the information to Plaintiff and members of the Class.

62.    Defendants intended that Plaintiff and the members of the Class rely on their deceptive acts and misrepresentations, and Plaintiff and the members of the Class were actually

deceived by Defendants' representations that their polycarbonate bottles were safe for use when in fact the products were not safe by virtue of the fact that they contained harmful BPA.

63.     If not for Defendants' deceptive and misleading representations, Plaintiff and members of the Class would not have purchased the polycarbonate bottles.

64.     Defendants were able to sell millions of products that they could not have sold absent their deceptive marketing campaign, causing the Plaintiff and members of the Class substantial injuries.

65.     The acts, practices, and misrepresentations by Defendants described above, with intent that Plaintiff and other members of the Class rely upon the deceptive acts and misrepresentations, constituted unfair and/or deceptive acts and practices occurring in the course of conduct involving trade or commerce within the meaning of 815 ILCS section 505/1, *et seq.*

66.     Defendants' misconduct in the course of trade and/or commerce offends public policy and is immoral, unethical, oppressive, and/or unscrupulous and caused substantial injury to consumers.

67.     Plaintiff and members of the Class suffered damages as a result of Defendants' deceptive and/or unfair acts.   Accordingly, Plaintiff, on behalf of himself and the other Class members, seek monetary damages, punitive damages and such other and further relief as set forth in the Illinois Consumer Fraud and Deceptive Business Practices Act.

**B.     IMPLIED WARRANTY CLAIMS**

**1.     COUNT III: FOR VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY ON BEHALF OF RESIDENTS OF CERTAIN STATES.**

68.     Count III is brought by Plaintiff, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New

Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass"). Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

69.    At all times, there were in effect the following statutes governing the implied warranty of merchantability: Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; CRS § 4-2-314; 6 Del. C. § 2-314; HRS § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann. Art. 95B § 2-314; Mass. Gen. Laws. Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; MCA 30-2-314; Neb. UCC 2-314; NRS 104.2314; N.J.S.A. 12A:2-314; NDCC 2-314; O.S. 1991 § 2-314; G.L. 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; SDCL 57A-2-314; Tex. Bus. & Com. Code Ann. § 2-314; VA. Code § 8.2-314; W. VA. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

70.    As a designer, manufacturer, producer, marketer, licenser and seller of polycarbonate bottles, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

71.    Avent polycarbonate bottles are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

72.    Implied in the sale of Avent polycarbonate bottles is a warranty of merchantability that requires, among other things, is that Avent polycarbonate bottles pass without objection in the trade and are of merchantable quality and safe and fit for such use.

73.    Because the polycarbonate bottles contained BPA and inherently caused damage to Plaintiff and Class members as a result of the BPA, the Avent polycarbonate bottles were unsafe and were therefore not merchantable at the times they were sold, as impliedly warranted by Defendants.

74.    Due to Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class could not have known about the risks associated with the BPA in the polycarbonate bottles until after Plaintiff suffered damage caused by the bottles.

75.    Defendants were put on notice of the BPA in the polycarbonate bottles by the numerous medical reports and studies concerning the defect.

76.    As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiff and members of the Class suffered damages as alleged herein.

**2.    COUNT IV: FOR BREACH OF EXPRESS WARRANTY**

77.    Count IV is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

78.    Defendant expressly warranted that the polycarbonate bottles were manufactured and were safe to use. Even today, Defendant states on its website: "We have been manufacturing baby bottles for nearly 25 years and we completely stand by our products and see no reason to phase out polycarbonate at this stage although we will continue to look at all of the options." http://www.consumer.philips.com/consumer/en/us/consumer/cc/_categoryid_PHILIPS_AVENT _ON_BPA_AR_US_CONSUMER/#id11 (July, 22, 2008)

79.    The polycarbonate bottles did not conform to these express representations, because the products were not safe for use due to the BPA found in them.

80.    Due to Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class could not have known about the risk posed by the polycarbonate until after Plaintiff suffered damage caused by the BPA.

81.    Defendants were put on notice of the danger caused by the polycarbonate bottles by the numerous medical reports and studies concerning BPA.

82.     As a direct and proximate result of the breach of said warranties, and as the direct and legal result of the BPA in the polycarbonate bottles as designed, manufactured, packaged, labeled, and supplied by Defendants, and other wrongdoing of Defendants described herein, Plaintiff and members of the Class were caused to suffer damages.

**C.      COUNT V: STRICT LIABILITY**

83.     Count V is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

84.     At all relevant times, Defendants were producers, manufacturers, and/or distributors of polycarbonate bottles.

85.     Polycarbonate bottles produced, manufactured, and/or distributed by Defendants were unreasonably dangerous in that, when the bottles left the hands of the Defendants they contained BPA which was harmful to the Plaintiff and members of the Class.

86.     Defendants' products were expected to and did reach Plaintiff and members of the Class without substantial change in condition.

87.     As a direct and proximate result of the unreasonably dangerous condition of the polycarbonate bottles, as produced, manufactured, and/or supplied by Defendants, Plaintiff and members of the Class have suffered direct economic loss.

**D.      COUNT VI: NEGLIGENCE**

88.     Count VI is brought by Plaintiff, individually and on behalf of the Class. Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

89.     Defendants had a duty to exercise reasonable care in the design, manufacture, sale, and/or distribution of polycarbonate bottles into the stream of commerce, including a duty to assure that the products did not cause harm or damage to consumers.

90.     Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of polycarbonate bottles into interstate commerce in that Defendants knew or should have known that the bottles contained

BPA that posed a risk of injuring the consumers. Defendants' failure to exercise reasonable care in the design, manufacture, sale, and/or distribution of the polycarbonate bottles was grossly negligent.

91.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing, and/or sale of polycarbonate bottles in that they:

a. Failed to use due care in designing, and/or manufacturing the relevant products so as to avoid the aforementioned risks to Plaintiff and Class members;

b. Failed to accompany their products with proper warnings regarding all possible adverse effects associated with the relevant products;

c. Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

d. Failed to warn Plaintiff and members of the Class prior to actively encouraging the sale of polycarbonate bottles either directly or indirectly, orally or in writing, about the following: that the polycarbonate bottles contained BPA and could be harmful as described herein, and

e. Were otherwise careless or grossly negligent.

92.    Despite the fact that Defendants knew or should have known that the polycarbonate bottles could cause unreasonable damage to Plaintiff and Class members, Defendants continued to market the relevant products to consumers including Plaintiff.

93.    Defendants knew or should have known that consumers such as Plaintiff and the Class would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

94.    Defendants' negligence was a proximate cause of Plaintiff's and the Class' economic damages, as previously set forth herein.

**D.    UNJUST ENRICHMENT**

**COUNT VII: UNJUST ENRICHMENT FOR RESIDENTS OF CERTAIN STATES**

95.    Count VII is brought by Plaintiff individually, and on behalf of all similarly situated residents of Alaska; Arkansas; California; Colorado; Connecticut; District of Columbia; Florida; Georgia; Hawaii; Illinois; Indiana; Iowa; Kansas; Kentucky; Maine; Michigan; Minnesota; Mississippi; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New

Mexico; New York; North Carolina; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Utah; Vermont; Virginia; Washington; West Virginia; and Wisconsin for unjust enrichment (the "18-State Unjust Enrichment Subclass"). Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here.

96.    At all times relevant hereto, Defendants designed, manufactured, produced, marketed, and/or sold polycarbonate bottles that contained BPA.

97.    Plaintiff and members of the Class conferred upon Defendants, without knowledge that the polycarbonate bottles posed a risk of damaging consumers, payment for the polycarbonate bottles, which are benefits that were non-gratuitous.

98.    Defendants appreciated, or had knowledge of the non-gratuitous benefits conferred upon them by Plaintiff and members of the Class.

99.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiff and members of the Class were not receiving products of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

100.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Plaintiff and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

E.    **COUNT VIII: ALTERNATIVE CLAIM FOR RELIEF UNDER THE STATE CONSUMER PROTECTION ACTS[3]**

101.    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth here and further allege as follows:

102.    Count VIII is brought by Plaintiff, individually, and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:

---

[3] This Count is plead in the alternative to Counts I and II.

a.  the Alaska Unfair Trade Practices And Consumer Protection Act, AS § 45.50.471 *et seq.*;

b.  the Arizona Consumer Fraud Act, A.R.S §§ 44-1521 *et seq.*;

c.  the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101 *et seq.*;

d.  the California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq.* and 17500 *et seq.*;

e.  the California Consumers Legal Remedies Act, Civil Code §1750, *et seq.*;

f.  the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

g.  the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

h.  the Delaware Consumer Fraud Act, 6 Del. C. § 2513., *et seq.*;

i.  the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

j.  the Florida Deceptive And Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

k.  the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

l.  the Hawaii Unfair Competition Law, H.R.S. § 480-2, *et seq.*;

m.  the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

n.  the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

o.  the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

p.  the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

q.  the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

r.  the Louisiana Unfair Trade Practices And Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

s.  the Maine Unfair Trade Practices Act 5 M.R.S.A. § 207, *et seq.*;

t.   the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;

u.   the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

v.   the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

w.   the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, *et seq.*;

x.   the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

y.   the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq.*;

z.   the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*

aa.  the New Hampshire Regulation of Business Practices For Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq.*;

bb.  the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

cc.  the New Mexico Unfair Practices Act, N.M.S.A. 1978 §§ 57-12-1, *et seq.*;

dd.  the New York Consumer Protection from Deceptive Acts and Practices, GBL § 349, *et seq.*;

ee.  the North Carolina Unfair And Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

ff.  the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq.*;

gg.  the Ohio Consumer Sales Practices Act, <u>R.C. 1345.01</u>, *et seq.*;

hh.  the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

ii.  the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

jj.  the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

kk. the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

ll. the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

mm.   the South Dakota Deceptive Trade Practices and Consumer Protection, SDCL § 37-24-1, *et seq.*;

nn. the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

oo. the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

pp. the Utah Consumer Sales Practices Act, UT ST § 13-11-175, *et seq.*;

qq. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

rr. the Virginia Consumer Protection Act of 1977, VA ST § 59.1-199, *et seq.*;

ss. the Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

tt. the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A, *et seq.*;

uu. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq.*; and

vv. the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

103.   The acts, practices, misrepresentations and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

104.    Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged Plaintiff and members of the Class in connection with the sale or advertisement of polycarbonate bottles. Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

105.    Plaintiff, on behalf of himself and the other Class members, seeks monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

## VII. JURY TRIAL DEMANDED

106.    Plaintiff and the proposed Plaintiff Class demand a jury of twelve.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, request that he and the other applicable Plaintiff Class members have judgment entered in their favor and against Defendants, as follows:

A.    An order certifying that this action, involving Plaintiff's and the Plaintiff Class members' claims against Defendant Avent and the Defendant Class be maintained as a nationwide class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and their undersigned counsel to represent the Plaintiff Class;

B.    An award of actual damages in the form of restitution;

C.    Appropriate injunctive relief;

D.    Reasonable attorneys' fees and costs; and

E.    Such further appropriate relief this Court deems necessary.


Plaintiff TOM BRADY, individually, and on
behalf of all others similarly situated,


By:    s/ Thomas A. Zimmerman, Jr.
          Thomas A. Zimmerman, Jr. (Bar # 6231944)
          Hugh J. Green (Bar # 6289616)
          ZIMMERMAN LAW OFFICES, P.C.
          100 West Monroe Street, Suite 1300
          Chicago, Illinois 60603
          (312) 440-0020

Counsel for the Plaintiff and Class